IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

DIMITRI CHARALAMBOPOULOS,    §
                                       §
         Plaintiff-counterdefendant,   §
                                       §   Civil Action No. 3:14-CV-2424-D
VS.                                 §
                                     §
CAMILLE GRAMMER,           §
                                     §
        Defendant-counterplaintiff.  §

MEMORANDUM OPINION
AND ORDER

Plaintiff-counterdefendant Dimitri Charalambopoulos ("Charalambopoulos") sues

defendant-counterplaintiff Camille Grammer ("Grammer") for defamation and related claims

arising from her accusations that he assaulted her and tried to gain entry to her neighborhood

in violation of a protective order.  Grammer moves for partial summary judgment.  For the

reasons that follow, the court grants the motion in part and denies it in part.

I

Because this case is the subject of several prior memorandum opinions and orders,

*see, e.g., Charalambopoulos v. Grammer*, 2015 WL 2451182 (N.D. Tex. May 22, 2015)

(Fitzwater, J.) ("*Charalambopoulos II*"); *Charalambopoulos v. Grammer*, 2015 WL 390664

(N.D. Tex. Jan. 29, 2015) (Fitzwater, J.) ("*Charalambopoulos I*"), the court will recount only

the background facts and procedural history that are pertinent to this decision.[1]

---

[1]In deciding Grammer's motion for partial summary judgment, the court views the
evidence in the light most favorable to Charalambopoulos as the summary judgment
nonmovant and draws all reasonable inferences in his favor.  *See, e.g., Owens v.*

In October 2013 Grammer, an American television personality and the former wife of actor Kelsey Grammer, was diagnosed with cancer and traveled to M.D. Anderson hospital in Houston for surgery. After her surgery, Grammer and Charalambopoulos, who was then her boyfriend, stayed at the Hotel ZaZa in Houston while Grammer recovered.

According to Charalambopoulos, early in the morning of October 16, 2013, Grammer awakened him to confront him about a text message he had received from a female friend who had helped arrange Grammer's treatment at M.D. Anderson. Grammer yelled at him, broke his cell phone, and began to strike him. Charalambopoulos then called Grammer a "fame whore," at which point she became "violently enraged," threatening "to call the police and say that [Charalambopoulos had] abused her." P. Br. 1 (quoting P. App. 2). Charalambopoulos contends that he gathered his belongings and departed without physically assaulting Grammer.

After Charalambopoulos left, Grammer told a hotel employee that "her boyfriend had just assaulted her" (the "Alleged Assault"), and the hotel employee called the police. *Id.* at 2 (quoting P. App. 70). After Houston Police Department ("HPD") Officer Matthew Vo ("Officer Vo") arrived at the scene, Grammer told him that Charalambopoulos had pulled her hair, gotten on top of her, pinned her down, and pushed her nose upward, making her head tilt back.

---

*Mercedes-Benz USA, LLC*, 541 F.Supp.2d 869, 870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)).

After Grammer returned to California, she filed on October 29, 2013 a request for a domestic violence restraining order (the "Request for Restraining Order") in the Los Angeles County Superior Court based on the Alleged Assault. Before Grammer filed the Request for Restraining Order, however, she tweeted to more than 198,000 followers on her Twitter account the following tweets: "Info will come out today that is jaw dropping. And women can't be silenced after being physically abused!" "Yes, it was horrible what happened to me two days out of the hospital," and "I was in fear for my life." P. App. 224-25. Grammer's tweets attracted the attention of multiple media outlets that reported on the Alleged Assault and Request for Restraining Order. Grammer also appeared on *The Dr. Oz Show*, where she told the host and viewers that she had been "physically abused and assaulted." P. Br. 3 (citation omitted). After conducting a contested hearing on January 6, 2014, the California Superior Court entered a Restraining Order After Hearing ("Order of Protection") based on "a preponderance of the evidence." D. App. 343, 349.

In Texas, the HPD assigned Officer Bertha Massie ("Officer Massie") to investigate the Alleged Assault. During the investigation, Grammer gave Officer Massie three statements. Officer Massie called Grammer and took her first statement on October 29, 2013. Two days later, Grammer called Officer Massie and gave a second statement. Officer Massie took Grammer's third statement a few weeks later. Charalambopoulos contends that Grammer's third statement was supplied by Grammer in writing and was unsolicited by Officer Massie. On November 22, 2013 Charalambopoulos was charged with third degree felony assault of a family member by impeding breath. A Harris County magistrate judge

entered a protection order against him.  Charalambopoulos was detained, fingerprinted, and photographed before being released on bond.

In April 2014 Grammer accused Charalambopoulos of trying to gain access to her residence, in violation of court orders.  According to Grammer, on April 7, 2014 a male and female drove up to her secured neighborhood guardhouse and informed the security guard that the female had an appointment with Grammer.   Based on a photograph of Charalambopoulos that was posted inside the guardhouse, the security guard identified the male driver as Charalambopoulos.  The security guard contacted Grammer to ask whether she was expecting an appointment.  He informed Scott MacLean ("MacLean"), Grammer's assistant, and Grammer that the male driver was Charalambopoulos.  Grammer alleges that, after learning this information, she called Jen Heger ("Heger") of RadarOnline.com ("RadarOnline") to find out whether any photographers employed by RadarOnline had seen Charalambopoulos in the Los Angeles area, and she told Heger what the guard had told her about the incident at the guardhouse (the "Alleged Stalking").[2]  Charalambopoulos contends that "[o]nce again, the media reported [Grammer]'s allegations against Charalambopoulos." P. Br. 5.  When Grammer reviewed the surveillance video eight days later, however, she determined that the male driver was not Charalambopoulos.

On May 28, 2014 a Harris County, Texas grand jury issued a "no bill," dismissing all criminal charges stemming from Grammer's allegation that Charalambopoulos had assaulted

---

[2]Grammer contends that she also sent text messages to various friends about the Alleged Stalking.

her on October 16, 2013.  Charalambopoulos then filed this lawsuit against Grammer in Texas state court, alleging claims for defamation, defamation per se, malicious prosecution, negligence, gross negligence/malice, fraud, and intentional infliction of emotional distress ("IIED").  Grammer removed the case to this court, answered, and asserted counterclaims for assault, battery, IIED, defamation, and defamation per se.[3]

Grammer moved to dismiss Charalambopoulos' amended petition under the Texas Citizens' Participation Act ("TCPA"), Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001-27.011 (West 2015), an anti-SLAPP statute.[4]  The court dismissed Charalambopoulos' claims for negligence, gross negligence, fraud, and IIED.  Regarding Charalambopoulos' claims for defamation and defamation per se, the court held:

> to the extent these claims are based on statements that Grammer made *in* the Request for Restraining Order, they are dismissed because such statements are absolutely privileged.  To the extent these claims are based on statements that Grammer made to Officer Vo, they are not dismissed.  To the extent they are based on Grammer's statements to third parties that do not pertain to any judicial or official proceeding—such as the tweets to her Twitter followers, her statements on *The Dr. Oz Show*, her statement to the Hotel ZaZa employee, and her statements to doctors at M.D. Anderson—they are not dismissed.  To the

---

[3]Grammer later amended her answer to only assert claims for assault, battery, and defamation per se.

[4]SLAPP is an acronym for strategic lawsuit against public participation. *See, e.g., In re Lipsky*, 411 S.W.3d 530, 536 n.1 (Tex. App. 2013, orig. proceeding) ("Chapter 27, also known as the Texas Citizens' Participation Act, is 'considered to be anti-SLAPP legislation. SLAPP stands for Strategic Lawsuit Against Public Participation, and approximately twenty-seven states have enacted anti-SLAPP legislation.'" (quoting *Jennings v. WallBuilder Presentations, Inc.*, 378 S.W.3d 519, 521 & n.1 (Tex. App. 2012, pet. denied))).

extent these claims are based on Grammer's allegedly making defamatory statements to the Los Angeles County Sheriff's Department regarding the Alleged Stalking, or making defamatory statements to the media pertaining to the Request for Restraining Order, or making defamatory statements to the media pertaining to the report of the Alleged Stalking to the Los Angeles County Sheriff's Department, the court defers a final decision and permits Charalambopoulos to conduct specified and limited discovery.

*Charalambopoulos I*, 2015 WL 390664, at *28. In *Charalambopoulos II* the court dismissed Charalambopoulos' defamation and defamation per se claims to the extent they were based on Grammer's publishing the contents of her Request for Restraining Order to the media and reporting (through her assistant) the Alleged Stalking to the Los Angeles County Sheriff's Department.

After obtaining leave of court, Charalambopoulos filed on December 28, 2015 a second amended complaint in which he asserts claims for defamation and defamation per se based on Grammer's publication of allegedly defamatory statements to 25 different individuals or entities,[5] malicious prosecution, negligence, and gross negligence/malice.

---

[5]Charalambopoulos alleges that Grammer published defamatory statements to the following on the dates shown in parentheses: (1) Hotel ZaZa Employee (10/16/2013); (2) M.D. Anderson physicians and staff (10/16/2013); (3) HPD Officer Vo (10/16/2013); (4) HPD Officer Massie (10/29/2013 and 10/31/2013); (5) tweets to 198,000 plus followers (10/28/2013); (6) "Dr. Oz Show" (11/14/2013); (7) Jen Heger of RadarOnline (10/28/2013-10/29/2013); (8) Dr. Estella Sneider of LA Talk Radio (4/8/2014); (9) Eric Mitchell of Hollywood Life; (10) Tina Majerie (between 4/8/2014 and 4/14/2014); (11) Larry (10/27/2013, between 4/8/2014 and 4/14/2014); (12) Carter Lay (between 4/8/2014 and 4/14/2014); (13) Taylor Armstrong (between 4/8/2014 and 4/14/2014); (14) Kyara (between 4/8/2014 and 4/14/2014); (15) Jeremy Larner (between 4/8/2014 and 4/14/2014); (16) Perry Maura (between 4/8/2014 and 4/14/2014); (17) Amy Charalambopoulos (10/25/2013); (18) Laura Berrios (10/22/2013); (19) Sergio Rico (10/27/2013); (20) Nicki of All Things Real

Grammer now moves for partial summary judgment on the following claims and defenses: Charalambopoulos' claims for negligence and gross negligence/malice; Grammer's defense of collateral estoppel; Charalambopoulos' claim for malicious prosecution; certain of Charalambopoulos' claims for defamation and defamation per se; Charalambopoulos' claim for exemplary damages (to the extent based on his defamation and defamation per se claims); and Charalambopoulos' claim for damages to finances caused by the necessity to hire California counsel.  Charalambopoulos opposes Grammer's motion.

## II

When a summary judgment movant will not have the burden of proof on a claim at trial, she can obtain summary judgment by pointing the court to the absence of evidence on any essential element of the nonmovant's claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once she does so, the nonmovant must go beyond his pleadings and designate specific facts demonstrating that there is a genuine issue for trial.  *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).  An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The nonmovant's failure to produce proof as to any essential element renders all other facts immaterial.  *See TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater,

---

Housewives (10/28/2013); (21) Kyle Umansky; (22) Tina Lay; (23) Dedra Dakota Whitt; (24) Rose Colona; and (25) Thea Johnston.

J.).  Summary judgment is mandatory where the nonmovant fails to meet this burden.  *Little*, 37 F.3d at 1076.

To be entitled to summary judgment on a claim or defense for which a party will have the burden of proof at trial, the party "must establish 'beyond peradventure all of the essential elements of the claim or defense.'"  *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).  This means that the moving party must demonstrate that there are no genuine and material fact disputes and that she is entitled to summary judgment as a matter of law.  *See Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003).  "The court has noted that the 'beyond peradventure' standard is 'heavy.'"  *Carolina Cas. Ins. Co. v. Sowell*, 603 F.Supp.2d 914, 923-24 (N.D. Tex. 2009) (Fitzwater, C.J.) (quoting *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007) (Fitzwater, J.)).

III

The court begins with Grammer's motion for summary judgment on Charalambopoulos' negligence and gross negligence claims.

A

Charalambopoulos bases his negligence claim on allegations that Grammer owed him a duty not to contact Heger and inform her that the security guard at her neighborhood guardhouse had said that Charalambopoulos had attempted to gain access to her residence, until Grammer could confirm the truth of this statement.  Charalambopoulos also maintains

that Grammer owed him a duty to contact Heger on April 15, 2014 and inform her that Grammer's prior statement about Charalambopoulos' trying to gain access to Grammer's residence was false.  Charalambopoulos alleges that Grammer breached these duties; that Grammer's breach proximately caused Heger to write a news story about the Alleged Stalking and not to later write a retraction story; and that Grammer's actions were done with malicious intent to cause injury to Charalambopoulos.   In support of his gross negligence/malice claim, Charalambopoulos alleges that

> [c]ontacting Jen Heger and accusing [Charalambopoulos] of attempting to gain access to [Grammer's] residence with knowledge that such conduct could severely damage [him] and cause [him] to be incarcerated for violating court ordered restraining order prior to viewing the surveillance video that [Grammer] had actual knowledge existed constitutes gross negligence/malice under Texas law.

2d Am. Compl. ¶ 28.

Grammer moves for summary judgment on these claims, contending that, under Texas law, a person owes no independent duty to another not to defame or maliciously prosecute that person by accusing him of criminal wrongdoing; that relief for a plaintiff alleging such harms resides in defamation and malicious prosecution causes of action; that Charalambopoulos' claim that Grammer owed him a duty not to contact Heger and tell her that Grammer had been informed that Charalambopoulos had attempted to gain access to her neighborhood does not exist independently of a claim that Grammer allegedly defamed Charalambopoulos to Heger; that, under Texas case law, a negligence claim cannot be brought for that alleged wrong; that although Charalambopoulos does not include the April

2014 statement to Heger in his defamation cause of action, he cannot avoid this rule of Texas law by electing not to assert a defamation claim based on this statement; and that there is no evidence that Grammer's statements to Heger proximately caused any damage to Charalambopoulos related to the publication of the RadarOnline articles themselves. Grammer moves for summary judgment on Charalambopoulos' gross negligence/malice claim on the additional ground that there is no genuine dispute that Grammer lacked actual awareness of the true facts when she contacted Heger and informed her of what the security guard had told her, because the evidence shows that Grammer honestly believed that Charalambopoulos had attempted to gain access to Grammer's neighborhood, and she was unaware at the time she contacted Heger that the information from the security guard was inaccurate. Regarding Charalambopoulos' allegation that Grammer did not correct her prior statement to Heger after Grammer saw the surveillance video, Grammer contends that there is no duty to correct a statement that was truthful; that Grammer's statement to Heger was and is true; that even if a duty to correct her prior statement existed, Grammer owed that duty to Heger, not to Charalambopoulous; and that, in any event, there is uncontroverted evidence that she called Heger "not too long after" reviewing the surveillance video on April 15, 2014 to inform her that it was not Charalambopoulos on the video. D. Br. 13 (quoting D. App. 53).

Charalambopoulos responds by pointing to the three *Erie* guesses the court made in *Charalambopoulos I*, 2015 WL 390664 at *6, 15, 22; arguing that, in *In re Lipsky*, 460 S.W.3d 579, 586-91 (Tex. 2015), the Supreme Court of Texas answered one of these

questions and reached the opposite result[6]; and requesting

> against this backdrop[,] that . . . this Court . . . reconsider the reasoning underlying one of its other *Erie*-guesses and find that Grammer owed Charalambopoulos a duty not to contact Heger and inform her that Charalambopoulos tried to access her residence until Grammer could confirm the truth of this statement and that Grammer owed Charalambopoulos a duty to inform Heger that Grammer's belief about Charalambopoulos trying to access Grammer's residence was false.

P. Br. 25-26.

B

1

In *Charalambopoulos I* the court dismissed Charalambopoulos' negligence and gross negligence claims based on Grammer's alleged breach of a duty "to not fabricate an assault and stalking allegations that never occurred." *Charalambopoulos I*, 2015 WL 390664, at *22 (quoting Am. Pet. ¶ 27).  The court explained:

> To support his contention that he has a viable negligence claim, Charalambopoulos relies on *Mitre v. Brooks Fashion Stores, Inc.*, 840 S.W.2d 612 (Tex. App. 1992, writ denied), *overruled on other grounds, Cain v. Hearst Corp.*, 878 S.W.2d 577, 579 (Tex. 1994). Although *Mitre* supports Charalambopoulos' position, it is inconsistent with *Oliphant v. Richards*, 167 S.W.3d 513 (Tex. App. 2005, pet. denied). . . . The Supreme Court of Texas has not addressed this question.  As the court explains above, because the Supreme Court of Texas has not

---

[6]In *In re Lipsky* the Supreme Court of Texas held that the TCPA "does not impose an elevated evidentiary standard or categorically reject circumstantial evidence," and it disapproved of "those cases that interpret the TCPA to require direct evidence of each essential element of the underlying claim to avoid dismissal." *In re Lipsky*, 460 S.W.3d at 591.

- 11 -

> decided this question, this court must make an *Erie*-guess about
> how it would rule.  The court predicts that the Supreme Court of
> Texas would follow similar reasoning to that of *Oliphant* and
> hold that a plaintiff "cannot maintain a negligence claim based
> solely on a duty not to defame," *Oliphant*, 167 S.W.3d at 518,
> and that "[t]hough a defamation claim not involving a public
> figure contains a negligence liability standard, that is a
> component of the defamation claim itself, not a separate claim,"
> *id.*

*Charalambopoulos I*, 2015 WL 390664, at *22.  Charalambopoulos provides the court with

no basis, other than the fact that the Supreme Court of Texas disagreed with this court's *Erie*

guess on a different, unrelated question of Texas law, for departing from the prediction the

court made in *Charalambopoulos I*.  Accordingly, the court declines to do so.  The court

holds, for the reasons explained in *Charalambopoulos I*, that Charalambopoulos cannot

maintain a negligence or gross negligence/malice claim based solely on a duty not to defame.

Accordingly, the court grants Grammer's motion for summary judgment on this claim.

2

Regarding Charalambopoulos' negligence claim based on Grammer's alleged failure

to contact Heger on or about April 15, 2014 and inform her that Grammer's claims about

Charalambopoulos' trying to gain access to Grammer's residence were false, Grammer has

adduced undisputed evidence that her statement to Heger that "the security guard at my

community said that [Charalambopoulos] drove up and was trying to gain access to my—get

in through the guard gate to get in," 2d Am. Compl. ¶ 17, was true.  Thus even assuming

*arguendo* that Grammer owed Charalambopoulos a duty to correct prior statements that she

later determined were false, Charalambopoulos has adduced no evidence that Grammer's

- 12 -

statement to Heger was false.  Accordingly, Grammer's motion for summary judgment on this ground of Charalambopoulos' negligence claim is granted.

3

Finally, Grammer is entitled to summary judgment dismissing Charalambopoulos' gross negligence/malice claim for the additional reason that Charalambopoulos has failed to produce evidence that would enable a reasonable trier of fact to find that Grammer had an actual awareness of the risks involved in making her statement to Heger without first watching the surveillance video, but that she decided to proceed in conscious indifference to the rights, safety, or welfare of others anyway.  Under Texas law, "Gross Negligence" means an act or omission:

> (A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and
> (B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

Tex. Civ. Prac. & Rem. Code Ann. § 41.001 (11)(A)-(B) (West 2015); *see also U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012) (explaining gross negligence elements). Grammer has introduced undisputed evidence that she honestly believed Charalambopoulos had attempted to gain access to her neighborhood, and that she was unaware that the information from the security guard was inaccurate at the time she contacted Heger. Grammer points to the absence of evidence that she was actually aware "of the risks involved but decided to proceed in conscious indifference to the rights, safety, or welfare of others

- 13 -

anyway," D. Br. 12, and Charalambopoulos has not produced any evidence in response. Accordingly, for this additional reason, Grammer is entitled to summary judgment dismissing Charalambopoulos' gross negligence/malice claim.

IV

Grammer moves for summary judgment on her affirmative defense of collateral estoppel, contending that because the California Superior Court found, in issuing the Order of Protection, that there was "overwhelming evidence that there was physical violence in that hotel room, that [Grammer] was subjected to at the hands of [Charalambopoulos]," D. Br. 14 n.9 (quoting D. App. 376), Charalambopoulos is precluded under the doctrine of collateral estoppel from relitigating the issue of whether he committed physical violence against Grammer in the Hotel ZaZa hotel room on October 16, 2013.

A

Under California law,[7] collateral estoppel applies when (1) the issue sought to be precluded from relitigation is identical to one decided in a former proceeding; (2) the issue was actually litigated in the former proceeding; (3) the issue was necessarily decided in the former proceeding; (4) the decision in the former proceeding is final and based on the merits; and (5) the party against whom preclusion is sought is the same as, or in privity with, the party to the former proceeding. *Lucido v. Superior Court*, 795 P.2d 1223, 1225 (Cal. 1990).

---

[7]"To determine the preclusive effect of a state court judgment in a federal action, federal courts must apply the law of the state from which the judgment emerged." *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 (5th Cir. 2006) (citation and internal quotation marks omitted).

"The party asserting collateral estoppel bears the burden of establishing these requirements."

*Id.*

Because collateral estoppel is an affirmative defense, *see* Fed. R. Civ. P. 8(c)(1),[8] to be entitled to summary judgment on this defense, Grammer must meet the heavy burden of establishing all of the essential elements of this defense beyond peradventure.

B

1

Grammer contends that the issue of whether Charalambopoulos committed physical violence against Grammer in the Hotel ZaZa hotel room on October 16, 2013 was "actually litigated" in the California Superior Court.  According to Grammer, this is

> because both Grammer and [Charalambopoulos] were represented by counsel, both submitted opposing declarations contesting whether [Charalambopoulos] engaged in an act of abuse on October 16, 2013, and the California Superior Court issued the restraining order only after conducting a contested hearing on the matter and determining that [Charalambopoulos] subjected Grammer to physical violence.

D. Br. 15 (footnotes omitted).  In a footnote, Grammer contends that it is irrelevant that the California Superior Court did not hear live testimony from Grammer and Charalambopoulos because Charalambopoulos "had an adequate opportunity to—and did—litigate the precluded issue."  *Id.* at 15 n.13.

_____

[8]Collateral estoppel is also an affirmative defense under California law.  *See, e.g., Fairmont Ins. Co. v. Superior Court*, 991 P.2d 156, 158 (Cal. 2000) (referring to collateral estoppel as affirmative defense).

Charalambopoulos responds that this issue was not "actually litigated" in the California Superior Court because he had no opportunity to obtain, much less introduce, material evidence from third-party witnesses refuting Grammer's physical assault allegations. According to Charalambopoulos:

> [t]he criminal charges Grammer procured against Charalambopoulos were pending when the hearing in California took place.  Because he was prohibited from contacting witnesses until resolution of the criminal matter, Charalambopoulos could not secure declarations from witnesses, while Grammer could and did.  This made the California proceeding entirely one-sided.  Without the ability to obtain declarations from witnesses other than himself, Charalambopoulos never had a chance to fully and fairly tell his side of the story.

P. Br. 9 (brackets, internal quotation marks, footnotes, and citations omitted). Charalambopoulos maintains that, in contrast, now that there are no criminal charges pending against him, he has engaged in discovery in this lawsuit and has obtained evidence contradicting Grammer's physical assault allegations, including proof from the Hotel Zaza employee who saw Grammer immediately after the Alleged Assault; Officer Vo, who interviewed Grammer immediately after the Alleged Assault; and the physician who examined Grammer hours after her alleged physical assault.

In reply, Grammer argues that whether the "actually litigated" test is met depends on the opportunities available to the litigant, not the degree to which a litigant actually uses them; that Charalambopoulos has failed to cite any authority from Texas or California under which he was precluded from contacting third-party witnesses due to the pending criminal

investigation of his conduct; that the Texas restraining orders prohibited Charalambopoulos

from contacting Grammer and members of her family or household, but did not, in any way,

prevent Charalambopoulos from contacting third-party witnesses, including the third-party

witnesses who Charalambopoulos contends could have offered favorable evidence; and that

under Cal. Fam. Code § 210, Charalambopoulos was entitled to use all of the discovery tools

available under the California Code of Civil Procedure, and he therefore had the opportunity

to conduct discovery, take depositions, subpoena third-party witnesses to produce documents

and sit for depositions, and contact third-party witnesses and obtain declarations to support

his case.  In sum, Grammer contends that Charalambopoulos

> should not be permitted to create the basis to relitigate an issue
> previously decided against him in a different tribunal because
> he, with the aid of three sets of counsel, made a conscious
> decision to for[]go tools available to him in the first forum.
> Such an outcome would contravene the policies that the doctrine
> of collateral estoppel is intended to prevent and would
> encourage a non-prevailing party to file a separate, subsequent
> action following an unfavorable outcome, contending he could
> have done things differently the first time.

D. Reply 9.

2

Under California law, to determine for preclusion purposes whether an issue was

"actually litigated," "the court in the subsequent action cannot rely exclusively on the

findings in the underlying action but must 'carefully scrutinize' the pleadings and proof."

*Douglas R. Ring, Inc. v. Marina Admiralty Co.*, 2009 WL 2038021, at *9 (Cal. Ct. App. July

15, 2009) (citation omitted).

- 17 -

> This scrutiny includes looking behind the findings at the evidence presented to determine what was actually decided. The party asserting collateral estoppel must prove the issue was raised, actually submitted for determination and determined and that contrary evidence on the issue was not restricted. *Further, the court must examine whether the party subject to collateral estoppel had a full and fair opportunity to litigate the issue.*

*Id.* (emphasis added) (citations omitted); *see also Antiques Off Fair Oaks, LLC v. Galapagos Holdings, LLC*, 2015 WL 9412804, at *10 (Cal. Ct. App. Dec. 22, 2015) ("The [collateral estoppel] bar is asserted against a party who had a *full and fair opportunity* to litigate the issue in the first case but lost."); *Union Pac. R.R. Co. v. Santa Fe Pac. Pipelines, Inc.*, 180 Cal.Rptr.3d 173, 209 (Cal. Ct. App. 2014) ("The purpose of issue preclusion is 'to prevent a party from repeatedly litigating an issue in order to secure a different result' *when it had a full and fair opportunity to do so previously.*" (emphasis added) (citation omitted)).[9]

During the January 6, 2014 hearing before the California Superior Court, Charalambopoulos' counsel stated to the court:

---

[9]Some California courts describe the "full and fair opportunity to litigate" as a policy consideration that the court must weigh *after* determining that the requirements outlined in *Lucido* are satisfied. *See, e.g., Arellano v. Progressive W. Ins. Co.*, 2013 WL 1261758, at *20 (Cal. Ct. App. Mar. 28, 2013) ("Even if the minimal requirements for application of collateral estoppel are satisfied, courts will not apply the doctrine if considerations of policy or fairness outweigh the doctrine's purposes as applied in a particular case, or if the party to be estopped had no full and fair opportunity to litigate the issue in the prior proceeding." (citation omitted)); *Ersheid v. Fernando*, 2010 WL 4911352, at *5 (Cal. Ct. App. Dec. 3, 2010) (same). Because Grammer and Charalambopoulos both address whether Charalambopoulos had a "full and fair opportunity to litigate" in the context of the "actually litigated" factor, the court will do so as well.

> given the pending criminal proceeding, [Charalambopoulos] has
> a very difficult time obtaining his own declarations from
> witnesses *because he is prohibited from contacting them until
> resolution of the matter*. He has a right to confront his accuser.
> And if this court is going to find that it has jurisdiction over him,
> then he should have the ability to come in and testify. And
> hopefully, if possible, this court would stay the matter until the
> criminal pending is resolved in Texas so that he can actually
> have his own witnesses come testify *because right [now] he has
> no ability to do that*. This proceeding is entirely one-sided at
> this juncture.

P. App. 318-19 (emphasis added). The court expresses no view on the factual accuracy of

Charalambopoulos' counsel's statements during the January 6, 2014 hearing.[10] It is enough

for purposes of deciding this summary judgment motion that counsel, speaking to the

California Superior Court in his capacity as an officer of the court, represented that

Charalambopoulos had been prohibited from contacting witnesses while the criminal

proceedings in Texas were pending, and, on that basis, expressed the hope that the California

court would stay the proceedings until the conclusion of Charalambopoulos' Texas criminal

trial, and contended that the California proceeding was entirely one-sided. Although

argument of counsel generally is not considered summary judgment evidence, in this instance

Charalambopoulos' counsel based his argument on what appears to be a factual

representation that he made to the California court in his capacity as an officer of the court.[11]

---

[10]As stated above, "the 'beyond peradventure' standard is 'heavy.'" *Carolina Cas. Ins. Co.*, 603 F.Supp.2d at 923-24 (quoting *Cont'l Cas. Co.*, 2007 WL 2403656, at *10). The court expresses no view on whether Grammer will be able to prevail on her collateral estoppel defense at trial under the preponderance of the evidence standard.

[11]*See, e.g., People v. Mroczko*, 672 P.2d 835, 851 (Cal. 1983) ("[A]ttorneys are officers of the court, and '"when they address the judge solemnly upon a matter before the

Moreover, "the papers of a party opposing summary judgment are usually held to a less exacting standard than those of the moving party." *Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 80 (5th Cir. 1987). Finally, the heavy burden of proof with respect to Grammer's affirmative defense is on Grammer, not on Charalambopoulos.

Accordingly, accepting Charalambopoulos' counsel's factual statements as true and drawing all reasonable inferences in Charalambopoulos' favor, as the court must, the court concludes that Grammer has not established "beyond peradventure" that the question whether Charalambopoulos subjected Grammer to physical violence on October 16, 2013 was "actually litigated" in the California proceedings, or that Charalambopoulos had a "full and fair opportunity" to litigate the issue. *See, e.g., Smith v. Exxon Mobil Oil Corp.*, 64 Cal.Rptr.3d 69, 79 (Cal. Ct. App. 2007) ("Mobil's fortuitous inability, through no fault of its own, to produce evidence on these crucial issues makes it impossible to say that the prior trial provided it a full and fair opportunity to present a defense."). Because there is a genuine issue of material fact concerning whether the parties "actually litigated" the issue of whether Charalambopoulos committed physical violence against Grammer on October 16, 2013, Grammer is not entitled to summary judgment on her affirmative defense of collateral estoppel.[12]

---

court, their declarations are virtually made under oath."'" (citation omitted)), *disapproved on other grounds in People v. Doolin* 198 P.3d 11, 36 n.22 (Cal. 2009)

[12]Because Grammer is not entitled to summary judgment on the affirmative defense of collateral estoppel, the court does not address Grammer's arguments premised on her having successfully established this affirmative defense.

V

Grammer moves for partial summary judgment on Charalambopoulos' defamation claim to the extent this claim is based on Grammer's statements to Officer Massie on October 29, 2013 and October 31, 2013.

A

Grammer contends that her statements to Officer Massie on October 29 and 31, 2013 were made after the HPD began its investigation into the Alleged Assault, after she made an initial report to Officer Vo, and in response to questions Officer Massie posed while soliciting further statements from Grammer. Accordingly, she maintains that these statements were made during the course of a judicial proceeding, are absolutely privileged, and that she is entitled to summary judgment to the extent Charalambopoulos' defamation claim is based on these statements.

In response, Charalambopoulos admits that Grammer's statement to Officer Massie on October 29, 2013 is privileged because the evidence attached to Grammer's motion establishes that, after an investigation had begun, authorities solicited that particular statement. But Charalambopoulos maintains that Grammer's October 31, 2013 statement to Officer Massie is not privileged, and that his defamation claim may proceed on that basis, because no evidence establishes that Officer Massie solicited the statement.

Grammer replies that, once an investigation begins and the police begin soliciting statements, the absolute privilege shields all statements made after that time in the course of the investigation, whether or not solicited. She relies on a transcript of Officer Massie's

audio recording of the October 31, 2013 telephone call during which Officer Massie asked Grammer a question, and she alleges that this evidence establishes that her statement was solicited.

### B

"Privileges applicable to defamation are of two classes—absolute and conditional or qualified." *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 768 (Tex. 1987). "An absolutely privileged communication is one for which, by reason of the occasion upon which it was made, no remedy exists in a civil action for libel or slander." *Reagan v. Guardian Life Ins. Co.*, 166 S.W.2d 909, 912 (Tex. 1942). This is true even if the communication was false and made or published with express malice. *Id.*; *Perdue, Brackett, Flores, Utt & Burns v. Linebarger, Goggan, Blair, Sampson & Meeks, L.L.P.*, 291 S.W.3d 448, 451 (Tex. App. 2009, no pet.). When the absolute privilege applies to a communication, it functions "as an immunity" because it is based on the actor's personal position or status and not on the actor's motivation. *Hurlbut*, 749 S.W.2d at 768; *Jenevein v. Friedman*, 114 S.W.3d 743, 745-46 (Tex. App. 2003, no pet.) ("The law allows absolute privilege or immunity for a communication because of the occasion in which it is made."). That is, the "absolute privilege is not a defense. Rather, absolutely privileged communications are not actionable." *CEDA Corp. v. City of Houston*, 817 S.W.2d 846, 849 (Tex. App. 1991, writ denied); *see also Reagan*, 166 S.W.2d at 912 (noting that communications subject to the privilege "cannot constitute the basis of a civil action").

The immunity conferred by the absolute privilege attaches "only to a limited and

- 22 -

select number of situations." *Hurlbut*, 749 S.W.2d at 768.   Relevant here, the absolute

privilege applies to "testimonial statements made in the course of judicial proceedings (and

particular statements preliminary to such proceedings) and to testimonial statements made

in the course of 'quasi-judicial' proceedings." *Cuba v. Pylant*, 814 F.3d 701, 715 (5th Cir.

2016) (citing *Shell Oil Co. v. Writt*, 464 S.W.3d 650, 654 (Tex. 2015)).   But initial

communications to a "public officer . . . who is authorized or privileged to take action" are

subject only to a qualified privilege, not absolute immunity.  *Hurlbut*, 749 S.W.2d at 768

(citation omitted).

> Texas law makes a distinction between straightforward reporting
> of alleged crimes and (once an investigation begins and a
> judicial proceeding is contemplated) statements made to
> investigators as a cooperating witness or made in pretrial
> proceedings.   The rule is, therefore, that an initial
> communication to police regarding alleged wrongdoing receives
> only a conditional privilege that is waived if the communication
> was made maliciously to defame or to procure a wrongful
> prosecution.  Once the police or prosecuting authority begins an
> investigation and solicits further statements, the absolute
> privilege obtains and shields subsequent statements, even if
> malicious and false.

*Cuba*, 814 F.3d at 715-16.  The question whether an alleged defamatory communication is

related to a proposed or existing judicial or quasi-judicial proceeding, and is therefore

absolutely privileged, is one of law to be determined by the court.  *Perdue*, 291 S.W.3d at

453; *Russell v. Clark*, 620 S.W.2d 865, 870 (Tex. Civ. App. 1981, writ ref'd n.r.e.).

C

Charalambopoulos does not dispute that Grammer's statement to Officer Massie on

- 23 -

October 31, 2013 is related to a contemplated judicial proceeding.  Instead, he contends that

there is no evidence that Officer Massie solicited the statement.  In her reply, Grammer relies

on *Cuba* to argue that "[o]nce an investigation begins and the police begin soliciting

statements, the absolute privilege shields all statements made after that time in the course of

the litigation, *whether solicited or not*."  D. Reply 22 (emphasis added).  The *Cuba* court did

not address the precise question whether a statement to the police during the course of an

investigation must be solicited in order to be shielded by the absolute privilege.  But in

summarizing Texas law, the court stated that, "[o]nce the police or prosecuting authority

begins an investigation *and solicits further statements*, the absolute privilege obtains and

shields subsequent statements, even if malicious and false."  *Cuba*, 814 F.3d at 715-16

(emphasis added).  This conclusion suggests that the absolute privilege only applies to

statements made after the police or prosecuting authority begins an investigation and solicits

further statements.  Because Grammer has pointed to no Texas or Fifth Circuit authority that

holds otherwise, the court will assume for purposes of deciding Grammer's summary

judgment motion that such a statement must have been solicited.  This conclusion is subject

to reconsideration at trial based on developments in Texas law and in this court's

understanding of the underlying principles on which the privilege is based.

Because there is a fact issue regarding whether Officer Massie solicited Grammer's

statements on October 31, 2013,[13] the court concludes that Grammer has not established

---

[13]In *Shell Oil Co.* the Supreme Court of Texas declined to decide whether the
"plaintiff has the burden to negate absolute privilege as part of proving its cause of action for

beyond peradventure that her statements to Officer Massie on October 31, 2013 are absolutely privileged and, accordingly, denies Grammer's motion for summary judgment on this ground.[14]

VI

Grammer moves for partial summary judgment on Charalambopoulos' defamation claim to the extent this claim is based the following tweets to Grammer's 198,000 followers: "Info will come out today that is jaw dropping.  And women can't be silenced after being physically abused!"  "Yes, it was horrible what happened to me two days out of the hospital," and "I was in fear for my life."  2d Am. Compl. ¶ 9.

A

Grammer first contends that she is entitled to partial summary judgment on the ground that her tweets, which "bear some relationship to" the Request for Restraining order, are absolutely privileged.

---

defamation, or whether absolute privilege is an affirmative defense where the elements must be proved by a defendant asserting it." *Shell Oil Co.*, 464 S.W.3d at 654.  Because the Fifth Circuit in *Cuba* treated the absolute privilege as an affirmative defense on which the defendant had the burden of proof, this court will do the same. *See Cuba*, 814 F.3d at 714 ("But the [defendants] have not borne their burden as to the absolute-privilege defense regarding Julia's initial police report and any prior statements. Finally, the [defendants] have not met their burden to make out an absolute-privilege defense for any statements to SMU.")

[14]Grammer filed, without leave of court, an appendix in support of her summary judgment reply in which she cites evidence that she contends establishes that Officer Massie solicited her statements on October 31, 2013.  D. Reply 22-23; D. Reply App. 2.  Because Grammer did not first obtain leave of court to file the appendix, the court has not considered it in deciding the summary judgment motion. *See Dethrow v. Parkland Health Hosp. Sys.*, 204 F.R.D. 102, 104 (N.D. Tex. 2001) (Fitzwater, J.) (holding that party may not file summary judgment reply appendix without first obtaining leave of court).

- 25 -

1

Under Texas law, the absolute privilege afforded to publications made in the course of judicial proceedings extends to communications "preliminary to a proposed judicial proceeding . . . if it has some relation to the proceeding." *James v. Brown*, 637 S.W.2d 914, 917 (Tex. 1982) (per curiam) (quoting Restatement (Second) of Torts § 588 (1981)); *see also Allstate Ins. Co. v. Plambeck*, 2012 WL 2130982, at *5 (N.D. Tex. Jan. 4, 2012) (Kaplan, J.) ("Even out-of-court statements are privileged if the statements bear some relationship to pending or contemplated litigation." (citations omitted)), *rec. adopted*, 2012 WL 2130912 (N.D. Tex. June 12, 2012) (Lynn, J.); *Dall. Indep. Sch. Dist. v. Finlan*, 27 S.W.3d 220, 238 (Tex. App. 2000, pet. denied) ("The privilege also applies to out-of-court communications if the communication bears some relationship to the proceeding and is in furtherance of the attorney's representation."). "The privilege extends to statements made by parties, their attorneys, and witnesses, and attaches to all aspects of the legal proceeding." *Allstate Ins. Co.*, 2012 WL 230982, at *5 (citations omitted). Whether a communication is related to a proposed or existing judicial proceeding is a question of law. *Daystar Residential, Inc. v. Collmer*, 176 S.W.3d 24, 28 (Tex. App. 2004, pet. denied); *Thomas v. Bracey*, 940 S.W.2d 340, 343 (Tex. App. 1997, no writ). When deciding the issue, the "court must consider the entire communication in its context, and must extend the privilege to any statement that bears some relation to an existing or proposed judicial proceeding." *Russell*, 620 S.W.2d at 870. All doubt should be resolved in favor of the communication's relation to the proceeding. *Id.*

- 26 -

2

In *Charalambopoulos I* the court held that statements that Grammer had made "*in* her Request for Restraining Order, which was filed in the Los Angeles County Superior Court on October 29, 2013, are absolutely privileged." *Charalambopoulos I*, 2015 WL 390664, at *25. Grammer now seeks to extend this privilege to her tweets, which preceded the filing of the Request for Restraining Order, on the basis that these statements "bear some relationship" to the Request for Restraining Order and, accordingly, are also absolutely privileged. D. Br. 24.

Charalambopoulos responds that Grammer's tweets contained slanderous statements implicitly accusing him of physically abusing Grammer, and they are not protected by immunity because they were not

> statements about motions on file with the court; statements made in an affidavit on file with the court; statements in a pleading on file with the court; statements summarizing allegations in a pleading on file with the court; or statements describing allegations in a pleading on file with the court.

P. Br. 22 (footnotes omitted). Charalambopoulous also contends that, because Grammer's statements were not statements made by an attorney in furtherance of the client's interest, her statements are not entitled to absolute immunity.

Grammer replies that Texas courts have extended the absolute privilege to out-of-court statements that bear "some relationship" to documents that have been filed with a court, D. Reply 12; that the privilege applies to communications *preliminary* to a proposed judicial proceeding if they have some relation to that proceeding; that the privilege applies to

communications made prior to a contemplated judicial proceeding even if made by a non-attorney; that if communications are made by a non-attorney, Texas courts do not require that the statement be made "in furtherance" of the attorney's representation; that Texas courts interpret the "bear some relationship" inquiry broadly and do not require that the communications explicitly refer to litigation or a legal proceeding; and that, in any event, Grammer's tweets "reference information that was to be imminently released in the Request for Restraining Order filed less than twenty-four hours later . . . and illuminate Grammer's rationale for seeking the restraining order in a judicial proceeding," *id.* at 18.

3

Where, as here, the court is exercising diversity jurisdiction, it is *Erie*[15]-bound to apply the law as would a Texas court. *See, e.g., Allstate Ins. Co. v. Shelby*, 672 F. Supp. 956, 958 (N.D. Tex. 1987) (Fitzwater, J.). The Supreme Court of Texas has not yet addressed whether the judicial proceedings privilege extends to out-of-court statements by a non-attorney. When there is no binding decision of the Supreme Court of Texas on the question, this court must make an "*Erie*-guess," i.e., a prediction of how that court would resolve the issue if presented with the same case. *See, e.g., Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010) (citing *Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948, 954 (5th Cir. 2009)). In doing so, this court is not required to be prescient. Instead, "'[w]hen confronted with an unsettled issue of state law, a federal court sitting in diversity must make

---

[15]*Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

its best effort to predict how the state courts would decide the issue.'" *Batts v. Tow-Motor Forklift Co.*, 66 F.3d 743, 750 (5th Cir. 1995) (quoting *DeWeerth v. Baldinger*, 38 F.3d 1266, 1273 (2d Cir. 1994)). *Erie* and its progeny require no more of a federal court than that it conscientiously satisfy its duty to predict how the state court would decide a question. *Id.*

A Texas court of appeals has held specifically that the privilege does not extend "to out-of-court communications by non-attorneys." *HMC Hotel Props. II Ltd. P'ship v. Keystone-Tex. Prop. Holding Corp.*, 2011 WL 5869608, at *15 (Tex. App. Nov. 23, 2011) (mem. op.), *rev'd on other grounds*, 439 S.W.3d 910 (Tex. 2014). In *HMC* the court noted that the extension of the privilege to out-of-court statements was based on the adoption of § 586 of the Restatement (Second) of Torts, which applies only to communications by attorneys. *See id.* It also noted that the adoption of § 586 was based on a "public policy rationale in favor of attorneys as officers of the court." *Id.* Based on these two considerations, the court held that the privilege for out-of-court statements applied only to attorneys. *See id.*

No Texas court of appeals has reached a different decision. At least one federal district court has made an *Erie* prediction like the one this court is making today. In *EEOC v. Simbaki, Ltd.*, 2013 WL 2368338, at *4 (S.D. Tex. May 29, 2013), *vacated and remanded on other grounds*, 767 F.3d 475 (5th Cir. 2014), the court predicted under *Erie* that "the privilege for communications in connection with a judicial proceeding does not apply to out-of-court statements by a non-lawyer." *Id.* at *4. In *Allstate Ins. Co.*, 2012 WL 2130982, at *4-5, a member of this court applied the privilege to out-of-court statements made by non-

- 29 -

attorneys, but the question whether the privilege applies in such circumstances does not appear to have been raised, briefed, or squarely decided.  *See id.* (applying privilege to out-of-court statements made in a news release by Allstate's vice president in charge of the Special Investigation Unit, and to two news articles reporting comments by Allstate spokesmen).

Based on the opinion of the court of appeals in *HMC,* and consistent with the *Erie* prediction made in *Simbaki*, the court predicts that the Supreme Court of Texas will decline to extend the judicial proceedings privilege to out-of-court statements by non-attorneys. Accordingly, the court denies Grammer's motion for summary judgment on the ground that her tweets are absolutely privileged.[16]

B

Grammer next contends that her tweets cannot support Charalambopoulos' defamation claim because they do not contain objectively verifiable facts but are, instead, expressions of her opinions.

1

To be actionable, a defamatory statement must assert an objectively verifiable fact rather than an opinion.  *Neely v. Wilson*, 418 S.W.3d 52, 62 (Tex. 2013); *Carr v. Brasher*, 776 S.W.2d 567, 570 (Tex. 1989) ("[A]ll assertions of opinion are protected by the [F]irst

---

[16]In her reply brief, Grammer cites *James* and *Shell Oil* in support of her contention that "the absolute privilege applie[s] to non-attorney's statements prior to a proposed judicial proceeding."  D. Reply 15.  Neither case, however, expressly contradicts the authorities on which this court relies to make its *Erie* prediction.

[A]mendment.").  The law, however, does not impose an "artificial dichotomy" between "fact" and "opinion." *Bentley v. Bunton*, 94 S.W.3d 561, 579-80 (Tex. 2002); *see also Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990) (holding that there is no "wholesale defamation exemption for anything that might be labeled 'opinion'").  Rather, in determining whether a statement is an actionable statement of fact, the court focuses on "a statement's verifiability and the entire context in which it was made."  *Bentley*, 94 S.W.3d at 581.  In other words, "a defamatory statement must be sufficiently factual to be susceptible of being proved objectively true or false."  *Thomas-Smith v. Mackin*, 238 S.W.3d 503, 507 (Tex. App. 2007, no pet.).  Therefore, a statement of opinion "can be actionable in defamation if it expressly or impliedly asserts facts that can be objectively verified."  *Palestine Herald-Press Co. v. Zimmer*, 257 S.W.3d 504, 509 (Tex. App. 2008, pet. denied).  On the other hand, a statement of opinion is not actionable where it cannot be objectively verified.  *Gateway Logistics Grp., Inc. v. Dangerous Goods Mgmt. Austl. Pty, Ltd.*, 2008 WL 1883914, at *10 (S.D. Tex. Apr. 25, 2008) (Rosenthal, J.).  Whether a publication is an actionable statement of fact is a question of law for the court.  *Bentley*, 94 S.W.3d at 580.

2

Grammer contends that her statement that information will come out that is "jaw dropping" is not an objectively verifiable fact but a subjective opinion and mere rhetoric since whether information is "jaw dropping" to the reader is an individual judgment that "rests solely in the eye of the beholder."  D. Br. 26 (citation omitted).  She posits that the same is true of her statement that women cannot be silenced after being physically abused,

- 31 -

because this statement, on its face, is not a statement of an objectively verifiable fact but is rather a comment or opinion by the speaker as to the importance or necessity of speaking out and to the harmfulness of women's remaining silent in the face of physical abuse.  As to her tweet that what happened to her two days out of the hospital was "horrible," Grammer contends that this statement contains no objectively verifiable facts, the statement does not accuse anyone of assaulting or physically abusing Grammer, and whether something is "horrible" is a subjective opinion of the speaker and means different things to different individuals.  Finally, Grammer argues that her statement, "I was in fear for my life," does not contain objectively verifiable facts but is merely a subjective opinion describing Grammer's feelings.   In sum, Grammer argues that all three tweets "convey Grammer's subjective feelings and opinions about an independent, privileged legal action she was entitled to pursue to protect her safety."  *Id.* at 27.

Charalambopoulos responds that Grammer's tweets implied false statements of fact; that looking at the tweets in their entirety, a person of ordinary intelligence could perceive these statements to mean that, two days after her surgery, Grammer had been subjected to severe physical abuse; that Grammer's assertion that she had been physically abused is verifiable; and if, as Charalambopoulos contends, the Alleged Assault never happened, the statements made in Grammer's tweets are "verifiably false," P. Br. 20.

3

When the court considers Grammer's three tweets in their entire context, as Texas law requires, *see Bentley*, 94 S.W.3d at 581, it concludes that the tweets impliedly assert that

- 32 -

Grammer had been the subject of physical abuse, a fact that can be objectively verified.  She stated that "[i]nfo will come out today that is jaw dropping," that "women can't be silenced after being physically abused," that what happened *to her* was "horrible," and that she was "in fear for [her] life."  2d Am. Compl. ¶ 9.  It requires only a small inferential leap to conclude that Grammer is stating in the tweets that she had been the subject of physical abuse.  The court concludes, as a matter of law, that the tweets are not mere expressions of opinion.

## C

Finally, Grammer contends that she is entitled to summary judgment because the tweets do not concern Charalambopoulos.

## 1

An essential element of defamation is publication of a defamatory statement "concerning" the aggrieved party.  *See WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998).  A publication is "of and concerning" the aggrieved party "if persons who knew and were acquainted with the [party] understood from viewing the publication that the allegedly defamatory matter referred to the [party]."  *Allied Mktg. Grp., Inc. v. Paramount Pictures Corp.*, 111 S.W.3d 168, 173 (Tex. App. 2003, pet. denied) (citing *Newspapers Inc. v. Matthews*, 339 S.W.2d 890, 894 (Tex. 1960)).  It is not necessary that the aggrieved party be specifically named in the publication, so long as it is clear to those who know and are acquainted with the party that the defamatory statement is directed to him.  *Vice v. Kasprzak*, 318 S.W.3d 1, 13 (Tex. App. 2009, pet. denied).  "'A defamatory communication is made

concerning the person to whom its recipient correctly, or mistakenly but reasonably, understands that it was intended to refer.'" *Houseman v. Publicaciones Paso del Norte, S.A. DE C.V.*, 242 S.W.3d 518, 525 (Tex. App. 2007, no pet.) (quoting Restatement (Second) of Torts § 564 (1977)).  Whether an aggrieved party is referenced in a defamatory statement is a question of law for the court.  *See Newspapers, Inc.*, 339 S.W.2d at 893.

2

Grammer contends that her tweets are not defamatory because they do not refer to Charalambopoulos directly or indirectly and, in fact, do not refer to a specific person at all: the first tweet alludes to "jaw dropping" information and states that women, in the plural, cannot be silenced after physical abuse, and the second and third tweets refer to an incident that was "horrible" for Grammer and left her "in fear for [her] life."  P. Br. 30.

Charalambopoulos responds that Grammer's tweets concern Charalambopoulos because they point to him and no one else, and he produces evidence that three different people reasonably believed—before the Request for Restraining Order was filed—that Grammer's tweets referenced Charalambopoulos.  Charalambopoulos points to evidence that one of Grammer's twitter followers ("@MickeyMouth1") responded, "Dimitri?," P. App. 226, to Grammer's tweets; that another twitter follower ("@Lshuman73") responded, "love you Camille, he never deserved you, you are more then what you may appeared to some to be lov from Mi," *id.* at 227; and that, later that day, Heger sent Grammer a text message asking, "what did he do to u?!," *id.* at 232, and "was it D[i]mitri?," *id.* at 242.

Grammer replies that the question whether a defamatory statement concerns the

- 34 -

plaintiff is an objective inquiry; that her tweets do not mention Charalambopoulos by name, do not implicitly reference him, and do not refer to a specific person at all, but merely reference some unspecified event; and that, accordingly, her tweets do not point to Charalambopoulos and no one else.

3

The court concludes that Grammer is not entitled to summary judgment on Charalambopoulos' defamation claim on the basis that her tweets were not a publication "of and concerning the plaintiff." *Houseman*, 242 S.W.3d at 525.  To prevail at trial on his defamation claims based on Grammer's tweets, Charalambopoulos must prove that Grammer's tweets were "specifically directed towards [hi]m." *Kaufman v. Islamic Soc'y of Arlington*, 291 S.W.3d 130, 144 (Tex. App. 2009, pet. denied).  In other words, "it must appear that [Charalambopoulos] is the person with reference to whom the statement was made." *Id.* (citing *Newspapers, Inc.*, 339 S.W.2d at 893).  As stated above, however, it is also true that it is unnecessary for the individual referred to be named if those who knew and were acquainted with Charalambopoulos understood from reading Grammer's tweets that they referred to him. *See id.* at 145 (citations omitted); *Allied Mktg. Grp., Inc.*, 111 S.W.3d at 173 ( holding that a publication is "of and concerning" the aggrieved party "if persons who knew and were acquainted with the [party] understood from viewing the publication that the allegedly defamatory matter referred to the [party]."). In *Houseman*, on which Grammer relies in her reply, the court explained "that the appropriate inquiry is objective, not subjective. 'Thus, the question is not whether some actual readers were mislead, as they

- 35 -

inevitably will be, but whether the hypothetical reasonable reader could be.'" *Houseman*, 242 S.W.3d at 525 (quoting *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 157 (Tex. 2004)).

It is undisputed that Grammer, a reality TV star, publicly dated Charalambopoulos and was dating him at the time of the Alleged Assault. And the court has already concluded that Grammer's tweets implied that Grammer had been the victim of physical abuse. In response to Grammer's summary judgment motion, Charalambopoulos has produced evidence that, in response to Grammer's tweets, at least three people responded with tweets that questioned whether Charalambopoulos was the person who had abused Grammer. Viewing this evidence in favor of Charalambopoulos as the summary judgment nonmovant, *Allied Mktg. Grp., Inc.*, 111 S.W.3d at 173, the court concludes that it is sufficient to show that at least some of the readers of Grammer's tweets reasonably understood the statements to refer to Charalambopoulos, and, further, that a hypothetical reasonable reader of Grammer's tweets could have understood them to refer to Charalambopoulos. Accordingly, the court denies Grammer's motion for summary judgment on this ground.[17] *See, e.g., Backes v. Misko*, 486 S.W.3d 7, 25-26 (Tex. App. 2015, pet. denied) (affirming, under Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c), that plaintiff had established by clear and specific evidence that

---

[17]Texas courts have held that "[q]uestions regarding defamation liability should be submitted to a jury only where a publication is of ambiguous or doubtful import." *Kaufman*, 291 S.W.3d at 144 (citation omitted). In denying Grammer's motion for summary judgment on Charalambopoulos' defamation claims based on her tweets, the court does not suggest that, at trial, the jury will decide whether Grammer's tweets were "of and concerning Charalambopoulos." The court holds only that, viewing the evidence in favor of Charalambopoulos, it cannot conclude as a matter of law that Grammer's tweets do *not* "concern" him.

allegedly defamatory statements "concerned" her because several individuals who had read the statements provided affidavits stating that they knew when reading the statements that they referred to the plaintiff); *Diaz v. Rankin*, 777 S.W.2d 496, 499-500 (Tex. App. 1989, no pet.) (reversing grant of summary judgment on basis that allegedly defamatory statement did not refer to the plaintiffs where plaintiffs presented affidavit evidence demonstrating that a least one person understood that defamatory statement referred to them).

VII

Grammer moves for summary judgment on Charalambopoulos' defamation claims based on Grammer's statements to Eric Mitchell ("Mitchell") of Hollywoodlife.com and on *The Dr. Oz Show*, arguing that these statements are absolutely privileged.  She contends that her statements to Mitchell and Dr. Oz were statements solicited from her that pertain to her assault allegations in the absolutely privileged Request for Restraining Order.  She contends that both statements were solicited following her filing of the Request for Restraining Order: Mitchell requested a quotation after the Request for Restraining order was filed, and, after her surgery, during an interview on *The Dr. Oz Show* after the Request for Restraining Order was filed, she answered a question from Dr. Oz pertaining to how traumatic it was to be assaulted.

The court has already made an *Erie* prediction that the Supreme Court of Texas will not extend the absolute judicial proceedings privilege to out-of-court statements by non-attorneys.  Accordingly, the court denies Grammer's motion for summary judgment on the basis of the absolute judicial proceedings privilege.

VIII

Grammer moves for summary judgment on Charalambopoulos' defamation claims based on her various statements regarding the Alleged Stalking.

A

1

Grammer contends that her statements that she thought Charalambopoulos would "rob [her] house," "kill [her]," "finish where he left off," "break into [her] house," and "confront [her]," 2d Am. Compl. ¶ 16, are statements about what she thought, believed, or feared, and are not statements of objectively verifiable facts that can give rise to a defamation claim. Charalambopoulos does not respond to Grammer's motion on this ground.

2

As noted above, the question whether a publication is an actionable statement of fact is a question of law for the court. *Bentley*, 94 S.W.3d at 580. Grammer contends that the following are not statements of fact, but are, instead, expressions of opinion concerning why she thought Charalambopoulos would have wanted to approach her neighborhood guardhouse, and were based upon the definitive conclusion, provided to her by the security guard, that Charalambopoulos was the driver of the vehicle that approached her neighborhood guardhouse:

> [1]    "I [sic] pretty sure that he was going to rob my house or finish where he left off in Houston . . . Kill me."  April 8, 2014 text message to Tina Majerie;
>
> [2]    "He lives in Texas so I think he knows I'm out of town

- 38 -

and he's [sic] was going to rob my house with his girl pal." April 8, 2014 text message to Larry;

[3] "I think he was going to rob my house." April 8, 2014 text message to Carter Lay;

[4] "I believe he came to rob me." "He would have called me. I believe he was coming to Rob my house. He knows my safes." April 12, 2014 text messages to Kyara;

[5] "I think he was going to Rob me." "Or kill me." April 12, 2014 text messages to Kyle Umansky;

[6] " . . . I think he was going to rob my house or who knows Manaus [sic] even kill me. . . ." April 8, 2014 Facebook message to Tina Lay;

[7] "He must know that I'm in Hawaii because of twitter and wanted to break into my house??" "Or he wanted to confront me." April 7, 2014 text messages to Rose Colona and Thea Johnston; and

[8] "Was going to try to rob my home with this girl [. . .] Creepy." April 7, 2014 text message to Rose Colona.

D. Br. 32-33 (citations omitted).[18]

In *Linan v. Strafco, Inc.*, 2006 WL 1766204 (Tex. App. 2006, no pet.) (mem. op.), which Grammer cites in her brief, a Texas court of appeals held that statements from a company's security director to his superior that "I feel that [plaintiff] is the cause of the cash problems at this store," and "[i]t is my suspicion and belief that [plaintiff] was involved in

---

[18]The dates Grammer lists for some of her text messages are different from the dates shown in her appendix. Because the court is quoting from Grammer's brief, the dates here reflect those included in Grammer's brief rather that the dates shown in the appendix.

the attempted theft of the motor," were not defamatory statements of fact but were, instead, the security director's opinion. *Id.* at *4-5. The court explained that the statements were "not an accusation, but rather [the defendant's] expression of his opinion or suspicion following his investigation." *Id.* at *6. "Therefore, looking at the surrounding circumstances, we cannot conclude the statements were defamatory facts. Rather they were opinions that are not actionable in this instance. A person of ordinary intelligence could not reasonably understand the complained-of statements to have a defamatory meaning." *Id.*

The court concludes that quoted statements 1 through 7, like the statements of opinion in *Linan*, are not actionable. In each quoted statement, Grammer expresses speculation about why Charalambopoulos might have approached her neighborhood guardhouse. The quoted statements are not "sufficiently factual to be susceptible of being proved objectively true or false." *Thomas-Smith*, 238 S.W.3d at 507. Accordingly, to the extent Charalambopoulos bases his defamation claim on statements 1 through 7, quoted above, the court grants Grammer's motion for summary judgment on this claim.

Statement 8, however, in which Grammer states to Rose Colona ("Colona"), "Was going to try to rob my home with this girl [. . .] Creepy," D. App. 88, is not a statement of opinion or suspicion but, instead, accuses Charalambopoulos of intending to try to rob her home. Even considered in its entire context, as Texas law requires, *Bentley*, 94 S.W.3d at 581, there is nothing in this text message that would signal to Colona that Grammer was

- 40 -

merely expressing an opinion or her suspicion.[19]  Accordingly, the court denies Grammer's

motion for summary judgment with respect to statement 8.

B

Grammer contends that she is entitled to summary judgment to the extent

Charalambopoulos bases his defamation claim on her statements to Mitchell because

Charalambopoulos has failed to allege the defamatory statements on which his defamation

claim is based.  Grammer then contends:

> Regarding Mitchell's reporting of Grammer's alleged oral
> statement that Plaintiff hit her and Grammer waking up in the
> middle of the night with a vision of being hit, Grammer
> specifically denied that she ever used the word "hit" in the
> interview with Mitchell.

D. Br. 37.  Grammer contends that, to the extent Charalambopoulos seeks to demonstrate that

she published defamatory statements to Mitchell about Charalambopoulos' hitting her, "there

is no evidence in the record disputing Grammer's testimony that she did not publish

statements to Mitchell about Plaintiff hitting her," *id.* and she is entitled to summary

judgment to the extent Charalambopoulos bases his defamation claims on alleged statements

to Mitchell that he hit Grammer.

Charalambopoulos does not respond to Grammer's motion on this ground.  Although

---

[19]At 2:48 a.m., Grammer set a group text message, including Colona among the
recipients, in which she stated: "He must know that I'm in Hawaii because of twitter and
wanted to break into my house??"  D. App. 86.  Her 3:28 a.m. text message to a different
group, again including Colona, states: "Was going to try to rob my home with this girl [ . .
. ] Creepy," *id.* at 88, without indicating that she was merely expressing an opinion or
suspicion about what Charalambopoulos was going to try to do.

- 41 -

his failure to respond to this ground of Grammer's motion does not permit the court to enter a "default" summary judgment on this claim, *see, e.g., Tutton v. Garland Indep. Sch. Dist.*, 733 F. Supp. 1113, 1117 (N.D. Tex. 1990) (Fitzwater, J.), "[a] summary judgment nonmovant who does not respond to the motion is relegated to [his] unsworn pleadings, which do not constitute summary judgment evidence," *Bookman v. Shubzda*, 945 F. Supp. 999, 1002 (N.D. Tex. 1996) (Fitzwater, J.) (citing *Solo Serve Corp. v. Westowne Assocs.*, 929 F.2d 160, 165 (5th Cir. 1991)).  Moreover,

> [i]f a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . (2) consider the fact undisputed for purposes of the motion [and] (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]

Rule 56(e)(2), (3).  Accordingly, because Charalambopoulos has not raised a genuine issue of material fact regarding whether Grammer published a defamatory statement to Mitchell about Charalambopoulos' hitting her, the court holds that Grammer is entitled to summary judgment dismissing Charalambopoulos' defamation claim to the extent he bases the claim on Grammer's allegedly publishing defamatory statements to Mitchell about Charalambopoulos' hitting her.

C

Grammer contends that she is entitled to summary judgment on Charalambopoulos' defamation claims based on her statements to Colona, Thea Johnston ("Johnston"), and Dedra Dakota Whitt ("Whitt") because these statements were substantially true.

1

On April 8, 2014 Grammer sent a text message to Colona and Johnston stating: "Hey girls I just got a call from security in Malibu in Serra were I live and Dimitri tried to get through the get w/ a woman who was Looking he for me."  D. App. 84 (grammatical and other errors in original).  Fifteen minutes later she wrote: "The security guard recognized him and called us back."  *Id.* at 85.  Two days later Grammer sent the following text messages to Whitt: "Dimitri was catch on security cameras trying to get into Serra Retreat. . So Scary!," *id.* at 96; "Caugh on camera with a girl trying to get through guard gates," *id.* at 97; "The police are working w/ me," *id.* at 98; and, in response to the question "How did u find out?" *id.* at 99, "The security guard," *id.* at 101, "Said it was him and a girl," *id.* at 102 (grammatical and other errors in original).  Grammer contends that she is entitled to summary judgment based on the affirmative defense that these statements were substantially true: "[w]hen read in context, the text messages state that [the security guard] told Grammer that [Charalambopoulos] tried to access her secured neighborhood, which is a true statement based on undisputed facts."  D. Br. 35.  Charalambopoulos does not respond to Grammer's motion on this ground.

2

If the plaintiff is a private person or entity, truth is an affirmative defense to a defamation claim; if the plaintiff is a public figure, falsity is a constitutionally required element of a prima facie case for defamation.  *See Hearst Corp. v. Skeen*, 159 S.W.3d 633, 636 n.1 (Tex. 2005) ("Proving falsity in a public-figure defamation case is the plaintiff's

burden of proof; in such a case, the defendant does not have the burden of proving substantial truth as an affirmative defense." (citing *Bentley*, 94 S.W.3d at 586-87)); *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995) ("In suits brought by private individuals, truth is an affirmative defense to slander." (citation and footnote omitted)). Grammer does not contend that Charalambopoulos is a public figure, and, in fact, she acknowledges in her brief that she "bears the burden of proving the truth of the statements." D. Br. 34 n.20.  Accordingly, to be entitled to summary judgment on Charalambopoulos' defamation claims based on Grammer's text messages to Colona, Johnston, and Whitt, Grammer must establish, beyond peradventure, the substantial truth of these text messages.

A showing of the substantial truth of Grammer's text messages will defeat Charalambopoulos' defamation claims based on these statements. *See McIlvain v. Jacobs*, 794 S.W.2d 14, 15-16 (Tex. 1990).  "The test used in deciding whether the [statement] is substantially true involves consideration of whether the alleged defamatory statement was more damaging to [the plaintiff's] reputation, in the mind of the average listener, than a truthful statement would have been." *Id.* at 16 (citation omitted); *see also Neely*, 418 S.W.3d at 63 ("We have developed the substantial truth doctrine to determine the truth or falsity of a broadcast: if a broadcast taken as a whole is more damaging to the plaintiff's reputation than a truthful broadcast would have been, the broadcast is not substantially true and is actionable." (citations omitted)).  "This evaluation involves looking to the 'gist' of the [statement]." *McIlvain*, 794 S.W.2d at 16.

- 44 -

Assessing a broadcast's gist is crucial. A broadcast with specific statements that err in the details but that correctly convey the gist of a story is substantially true. On the other hand, a broadcast "can convey a false and defamatory meaning by omitting or juxtaposing facts, even though all the story's individual statements considered in isolation were literally true or non-defamatory." We determine a broadcast's gist or meaning by examining how a person of ordinary intelligence would view it. "If the evidence is disputed, falsity must be determined by the finder of fact."

*Neely*, 418 S.W.3d at 63-64 (citations omitted).

3

Grammer has not established beyond peradventure that her text messages to Colona and Johnston on April 8, 2014 or to Whitt on April 10, 2014 were substantially true. In evaluating the affirmative defense of "substantial truth," the court evaluates the statements from the point of view of an "average listener," *Id.* at 64 n.16, to determine whether the "gist" of the story is substantially true. Viewed from this standpoint, Grammer's text messages suggest that Charalambopoulos actually tried to get into her neighborhood and was actually caught by the security guard and on camera. Grammer has not established under the heavy "beyond peradventure" standard that these statements, taken as a whole, are not more damaging to Charalambopoulos' reputation than a truthful broadcast would have been—i.e., that the neighborhood security guard had told her that Charalambopoulos had tried to access her secured neighborhood but that she had not, herself, verified whether this was true. Accordingly, the court denies Grammer's motion for summary judgment on this ground.

IX

Grammer contends that, under the Texas Defamation Mitigation Act ("TDMA"), Tex. Civ. Prac. & Rem. Code Ann. § 73.051-.062 (West Supp. 2016), Charalambopoulos is not entitled to exemplary damages on his defamation claims.

A

Under the TDMA, a defamation plaintiff cannot recover exemplary damages unless he serves a request for a correction, clarification, or retraction within 90 days of receiving knowledge of the publication.  Tex. Civ. Prac. & Rem. Code Ann. § 73.055(c) ("If not later than the 90th day after receiving knowledge of the publication, the person does not request a correction, clarification, or retraction, the person may not recover exemplary damages."). The Act further provides that, "[i]f a correction, clarification, or retraction is made in accordance with this subchapter, regardless of whether the person claiming harm made a request, a person may not recover exemplary damages unless the publication was made with actual malice."  *Id.* § 73.059.  If a defendant intends to rely on a timely and sufficient correction, clarification, or retraction, she must inform the plaintiff of her intent to do so and provide notice of the correction, clarification, or retraction.  *Id.* § 73.058(a).

B

On July 17, 2014 Charalambopoulos' attorney sent Grammer's attorney a letter pursuant to § 73.055 of the TDMA requesting that Grammer correct, clarify, or retract the following statements:

- 46 -

(1) to "[K]ristina [R]oyster the night manager at Hotel ZaZa," (2) to "Houston Police Office[r] M. H. Vo," (3) to "Alycia McKissack (Senior [] Patient Affairs Specialist at MD Anderson Hospital)," (4) "in [the] Request for Restraining Order," (5) "in Twitter posts on October 28, 2013," (6) to "Hollywoodlife.com," (7) "on Dr. Oz," and (8) "to law enforcement officers on or about April 2014 that Dimitri Charalambopoulos 'drove up to Camille's home.'"

D. Br. 38 (alterations in original) (quoting D. App. 104-06). Grammer argues that Charalambopoulos had knowledge of the first seven publications more than 90 days prior to his July 17, 2014 letter and therefore cannot recover exemplary damages based on these statements.[20] She contends, further, that, to the extent Charalambopoulos added additional allegedly defamatory statements when he filed his amended complaint on December 23, 2015, more than 90 days have passed since December 23, 2015, and because Grammer has not received any request to correct, clarify, or retract any additional publications, Charalambopoulos cannot recover exemplary damages based on those publications.[21]

---

[20]Grammer contends that Charalambopoulos had knowledge of Grammer's statements to Kristina Royster, Officer Vo, and Alycia McKissack on December 13, 2013 or January 9, 2014; that Charalambopoulos saw the Twitter posts and the Hollywoodlife.com article on October 29, 2013; and that Charalambopoulos had knowledge of Grammer's statements on *The Dr. Oz Show* in close proximity to its November 14, 2013 air date.

[21]Grammer contends that the "additional publications" include:

publications to Doctor Ramirez, Officer Massie, Jen Heger of *RadarOnline*, Dr. Estella Sneider, Tina Majerie, Larry, Carter Lay, Taylor Armstrong, Kyara, Jeremy Larner, Perry Maura, Amy Charalambopoulos, Laura Berrios, Sergio Rico, Nicki of *All Things Real Housewives*, Kyle Umansky, Tina Lay, Dedra Dakota Whitt, Rose Colona, and Thea Johnston.

D. Br. 40.

Grammer maintains that even though she did not receive any request from Charalambopoulos, she made a timely and sufficient correction of her statements related to the Alleged Stalking to a number of people,[22] and that Charalambopoulos did not challenge the timeliness or sufficiency of the corrections.  Finally, Grammer contends that her original statements regarding the Alleged Assault were made without actual malice because she honestly believed Charalambopoulos was the individual attempting to gain access to her secured neighborhood when she made the statements, and, for this additional reason, under Tex. Civ. Prac. & Rem. Code Ann. § 73.059, Charalambopoulos cannot recover exemplary damages for any of the corrected statements.

Charalambopoulos does not respond to Grammer's arguments on this point. Accordingly, as explained above, *see supra* § VIII (B), because Charalambopoulos has failed to raise a genuine issue of material fact on the question whether his request for exemplary damages is barred under the TDMA,[23] the court grants Grammer's motion for partial

---

[22]Grammer contends that she made a timely and sufficient correction of her statements regarding the Alleged Stalking to: "Jen Heger, Dr. Estella Sneider, Tina Majerie, Carter Lay, Taylor Armstrong, Kyara, Jeremy Larner, Perry Maura, Kyle Umansky, Tina Lay, Dedra Dakota Whitt, and Rose Colona." D. Br. 40.

[23]As Grammer states in her reply, Charalambopoulos has failed to raise a genuine issue of material fact that

> (1) he knew of the eight publications for which he requested a correction more than ninety days prior to making that request; (2) more than ninety days passed since he knew about the remaining publications on which he bases his defamation claims, yet [Charalambopoulos] made no request for correction of those statements; (3) that Grammer made a timely and sufficient correction of her statements related to the [Alleged

summary judgment on this ground.

## X

Grammer moves for summary judgment on Charalambopoulos' request for "damage to finances caused by the necessity to hire . . . California counsel." 2d Am. Compl. ¶ 31(d). She contends that the fees Charalambopoulos paid his California counsel were related to Grammer's Request for Restraining Order; that the court has already dismissed Charalambopoulos' defamation claims to the extent they are based on statements made in the Request for Restraining Order; and that Charalambopoulos cannot therefore prevail on any defamation claim that can be tied to the necessity to hire California counsel. She also contends that Charalambopoulos' malicious prosecution claim is not based on the California restraining order but is based solely on the Harris County criminal case; that Charalambopoulos' negligence claim deals solely with the Alleged Assault; and, therefore, that these purported damages—i.e., the necessity to hire California counsel—cannot be caused by any remaining claim in this litigation.

Charalambopoulos does not respond to these arguments. Accordingly, to the extent Charalambopoulos seeks to recover as damages the fees paid to California counsel, the court concludes that Charalambopoulos has not created a genuine issue of material fact that these damages were caused by any of the remaining claims in this case. Accordingly, the court

---

Stalking] to a number of individuals; and (4) that the original statements Grammer corrected were made without actual malice.

D. Reply 2.

grants Grammer's motion for summary judgment on this ground.

*   *   *

Accordingly, for the reasons explained, the court grants in part and denies in part Grammer's motion for partial summary judgment.

**SO ORDERED**.

February 15, 2017.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE