IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DIMITRI CHARALAMBOPOULOS, | § | |
| | § | |
| Plaintiff-counterdefendant, | § | |
| | § | Civil Action No. 3:14-CV-2424-D |
| VS. | § | |
| | § | |
| CAMILLE GRAMMER, | § | |
| | § | |
| Defendant-counterplaintiff. | § | |

MEMORANDUM OPINION
AND ORDER

In this memorandum opinion and order, the court decides the following seven motions: (1) defendant-counterplaintiff Camille Grammer's ("Grammer's") motion to partially modify scheduling order to permit defendant-counterplaintiff to re-designate Eric Holden ("Holden") as an expert in her case-in-chief; (2) Grammer's motion for bifurcated trial of exemplary damages; (3) Grammer's motion to strike plaintiff-counterdefendant Dimitri Charalambopoulos' ("Charalambopoulos'") designation of Pedro Ramirez, M.D. ("Dr. Ramirez") as an expert; (4) Grammer's motion to strike Charalambopoulos' expert Livia Liu Francis, Esquire ("Francis") and motion to strike re-designation of Francis as an affirmative expert; (5) Grammer's motion to strike Charalambopoulos' expert Joanna Collins ("Collins"); (6) Grammer's motion to strike Charalambopoulos' expert John Browning, Esquire ("Browning"); and (7) Grammer's motion to strike Charalambopoulos' expert Amy Gruszecki, D.O. ("Dr. Gruszecki").

I

This case is the subject of several prior memorandum opinions and orders. *See, e.g., Charalambopoulos v. Grammer*, 2017 WL 606639 (N.D. Tex. Feb. 15, 2017) (Fitzwater, J.); *Charalambopoulos v. Grammer*, 2015 WL 2451182 (N.D. Tex. May 22, 2015) (Fitzwater, J.); *Charalambopoulos v. Grammer*, 2015 WL 390664 (N.D. Tex. Jan. 29, 2015) (Fitzwater, J.). The court will therefore pretermit a general discussion of the background facts and procedural history and will discuss the pertinent matters in the context of the particular motion it is deciding.

II

The court begins with Grammer's motion to partially modify the scheduling order to permit defendant-counterplaintiff to re-designate Holden as an expert in her case-in-chief.

A

In its September 3, 2015 memorandum opinion and order, the court modified the August 13, 2014 scheduling order ("Scheduling Order") to require the parties to designate expert witnesses by October 1, 2015 and to designate rebuttal expert witnesses by December 1, 2015. *Charalambopoulos v. Grammer*, 2015 WL 5165344, at *5 (N.D. Tex. Sept. 3, 2015). On December 1, 2015 Grammer designated Holden as a rebuttal expert on the subject of polygraph examinations. On May 20, 2016, several months after the deadline to designate expert witnesses, she filed the instant motion to partially modify the Scheduling Order to

permit her to re-designate Holden as an affirmative expert.[1]

## B

When deciding whether to allow late designation of an expert witness, the court's discretion is guided by four factors: "(1) the explanation for the failure to identify the witness, (2) the importance of the testimony, (3) the potential prejudice in allowing the testimony, and (4) the availability of a continuance to cure such prejudice." *Wright v. Blythe-Nelson*, 2001 WL 804529, at *2 (N.D. Tex. July 10, 2001) (Fitzwater, J.) (citing *Geiserman v. MacDonald*, 893 F.2d 787, 791 (5th Cir. 1990)). The court considers the four factors holistically and "does not mechanically count the number of factors that favor each side." *EEOC v. Serv. Temps, Inc*., 2009 WL 3294863, at *3 (N.D. Tex. Oct. 13, 2009) (Fitzwater, C.J.), *aff'd*, 679 F.3d 323 (5th Cir. 2012). When, as here, the scheduling order prescribes the timeline for expert witness designation, the district court has "'broad discretion to preserve the integrity and purpose of the pretrial order.'" *Geiserman*, 893 F.2d at 790 (quoting *Hodges v. United States*, 597 F.2d 1014, 1018 (5th Cir. 1979)).

## C

### 1

The court initially considers Grammer's explanation for seeking leave to re-designate Holden as an affirmative expert witness in her case-in-chief after the deadline. Grammer

---

[1]By "affirmative" expert, Grammer means an expert who will testify in support of a claim or defense on which Grammer will have the burden of proof at trial and that she intends to call as a witness in her case-in-chief rather than as a rebuttal witness.

contends that, although she timely designated Holden as a rebuttal expert, she did not designate him as an expert in her case-in-chief because she was unaware of the potential affirmative expert testimony that Holden might offer to support her defenses and to establish the elements of her affirmative claims against Charalambopoulos until after she deposed Joe Morris ("Morris") and Michael Park ("Park")—the individuals who administered polygraph examinations to Charalambopoulos in November 2013—and discovered "the highly suspicious nature of the procurement and scoring of the two polygraph examinations."  D. 5/20/16 Br. 2.[2]  Grammer contends that, once this information came to light as a result of the Morris and Park depositions, she amended her claims against Charalambopoulos to assert that the manner of procuring the polygraph exams, the scoring methodology, and the unsupportable conclusions afforded the exams by Park and Morris constituted evidence that Charalambopoulos knowingly defamed her by claiming that she fabricated the allegations of assault (the "Alleged Assault"), and that the polygraph exam results supported her allegations of fabrication.  Grammer maintains that

> [a]s a result, Mr. Holden's testimony and expert opinions were now no longer limited to impugning [Charalambopoulos'] effort to introduce polygraph evidence in an attempt to establish [Charalambopoulos'] innocence of the assault, but are relevant to explaining how egregious the polygraph exams, scoring, and conclusions are in order to support Grammer's claims of defamation against [Charalambopoulos] and defend against the claims of fabrication.

---

[2]Due to the number of motions being decided in this memorandum opinion and order and the number of pertinent briefs and appendixes filed, the court will cite the brief or appendix by the party who filed it and the date filed.

*Id.* at 7.

Charalambopoulos responds that Grammer cannot show good cause to modify the Scheduling Order because she knew about the polygraph examinations and their results for at least 24 months prior to the October 1, 2015 deadline.  He maintains that, despite this knowledge, Grammer never sought to conduct any discovery regarding the methodology used in administering the polygraphs or the reliability of these methods, and did not notice the depositions of Morris or Park until nine months after the original expert designation deadline.[3]  Charalambopoulos contends that Grammer has offered no explanation for why she made no effort before the applicable deadline to obtain information regarding the "highly suspicious nature of the procurement and scoring of the two polygraph examination[s]," P. 6/10/16 Br. 3, and that she has made no attempt to show that she made a diligent effort to obtain this information or explain why she could not have procured it in a timely manner.

Grammer replies that Charalambopoulos' argument about her lack of diligence omits the fact that a discovery stay was in place until May 22, 2015.  Grammer posits that, once the stay was lifted, she prioritized discovery from other fact witnesses because, until she deposed Park and Morris, she neither knew nor should have anticipated the gross irregularities in the polygraph examinations.  She further contends that, when Charalambopoulos did not designate Park and Morris by the October 1, 2015 expert designation deadline, she immediately initiated third-party discovery from them, serving them with subpoenas to

---

[3]The Scheduling Order originally set a March 1, 2015 deadline for designating experts.  Grammer noticed the depositions of Morris and Park on December 8, 2015.

produce documents on October 5, 2015 and deposition notices on November 20, 2015.

2

The court concludes that the first factor weighs slightly in favor of granting leave. Grammer has demonstrated good cause for failing to designate Holden by the October 1, 2015 deadline: she did not know until she deposed Morris and Park that she would be able to rely on the circumstances surrounding the two polygraph examinations to support her defamation claim and defend against Charalambopoulous' claims.   To the extent Charalambopoulos argues that Grammer failed to exercise reasonable diligence in pursuing the depositions of Holden and Park, the court disagrees.   As both sides point out, the admissibility of the polygraph examination reports themselves has been a contested issue throughout the discovery period.   Grammer explains that

> [a]t the time of the October 1, 2015 deadline to designate affirmative experts . . . [she] did not designate Holden as an expert in her case-in-chief, because, at that time, the anticipated use of Holden as an expert was to rebut testimony or evidence, such as the polygraph examination reports themselves, *in the event Plaintiff succeeded in having such evidence admitted at trial*.

D. 5/20/16 Br. 2 (emphasis added).   Once the October 1, 2015 deadline passed and Charalambopoulos did not designate Morris or Park as an affirmative expert in support of his case-in-chief, Grammer immediately served written discovery requests, and noticed depositions of Morris and Park the following month.   At that point, Grammer still believed that she would use Holden only as rebuttal expert.   Grammer maintains in her reply that, before she deposed Morris and Park, she "neither knew of nor should have anticipated the

- 6 -

gross irregularities in the polygraph examinations." D. 6/24/16 Reply 6. The court has no basis to doubt this assertion. Without this knowledge, Grammer's waiting until November 2015 to notice the depositions of Morris or Park does not demonstrate a lack of diligence.

Despite the foregoing conclusion, Grammer has not explained why she waited more than five months after deposing Morris and Park[4] to file her motion to modify the Scheduling Order. Accordingly, although the court finds that the first factor weighs in Grammer's favor, it concludes that this factor weighs only slightly in her favor. This is because Grammer did not promptly move to modify the Scheduling Order after she deposed Morris and Park, and realized she would be able to rely on the circumstances surrounding the two polygraph examinations to support her defamation claim and defend against Charalambopoulous' claims.

D

The court next considers the importance of the testimony that Grammer seeks to introduce.

1

Grammer contends that Holden's testimony is relevant to explaining "how egregious the polygraph exams, scoring, and conclusions are in order to support Grammer's claims of defamation against [Charalambopoulos] and defend against the claims of fabrication." D. 5/20/16 Br. 7.

---

[4]Morris and Park were both deposed on December 8, 2015. As noted above, Grammer filed her motion to modify the Scheduling Order on May 20, 2016.

Charalambopoulos responds that Holden's expert testimony regarding the polygraph results is unimportant because the polygraph results are likely inadmissible.  According to Charalambopoulos,

> [a]lthough the Court has not made . . . a ruling as to the admissibility of the polygraph exams and conclusion[s], [Grammer's] own motion spends significant time enumerating reasons why the polygraph exams and results are not scientifically reliable. . . .  Assuming arguendo, [Grammer's] complaints with regard to the methodology, reliability, and conclusions of Morris and Park are convincing to this Court, it is unlikely the polygraph result will be admitted at trial. Therefore, any testimony regarding the polygraph and its deficiencies has no importance.

P. 6/10/16 Br. 6.

Grammer replies that she does not seek to admit the polygraph results to prove that the Alleged Assault took place; she instead seeks to use the polygraph examinations and surrounding data to demonstrate that Charalambopoulos knowingly orchestrated an effort to defame her by relying upon polygraph examinations that he and his counsel knew suffered from various infirmities.   Grammer therefore maintains that her proposed use of the polygraph evidence does not hinge on whether the polygraph results are scientifically reliable.  She also posits that Charalambopoulos' attorney submitted for distribution to the grand jury the polygraph reports reciting that Charalambopoulos had "passed" the polygraphs, and she argues that, if Charalambopoulos' evidence of the grand jury's no bill is permitted, she should be entitled to introduce evidence about the polygraph examinations themselves to demonstrate that the grand jury may have relied on manipulated polygraph

- 8 -

examinations in reaching its decision not to indict Charalambopoulos. Grammer contends that her expert evidence concerning Charalambopoulos' polygraph examinations and their deficiencies is important, despite Charalambopoulos' attempt to cast the polygraphs as inadmissible.

2

The court concludes that the evidence is important. In the Fifth Circuit, there is no *per se* rule against the admissibility of polygraph evidence. *United States v. Posado*, 57 F.3d 428, 431-36 (5th Cir. 1995). But even if the court assumes *arguendo* that the polygraph results themselves are inadmissible, Grammer has still established that Holden's testimony is important. First, his testimony supports Grammer's theory that Charalambopoulos knowingly used faulty polygraph test results to defame Grammer. And, second, to the extent Charalambopoulos intends to rely on the grand jury's decision to return a no bill to prove that he did not assault Grammer, and assuming that the foundation is laid that the grand jury had the polygraph results, Grammer should be permitted to rely on Holden's testimony to explain why the polygraph results on which the grand jury may have relied in reaching its conclusion were "manipulated" and otherwise infirm. D. 6/24/16 Reply 4.

E

The court considers, together, the potential prejudice to Charalambopoulos in allowing Grammer to designate Holden as an expert, and the availability of a continuance to cure any prejudice.

1

Grammer contends that allowing her to designate Holden as an affirmative expert in her case-in-chief will not prejudice Charalambopoulos because Holden does not intend to change or add to the opinions that he would have offered as a rebuttal expert; Holden's opinions are set out in the expert report provided to Charalambopoulos over five months ago; Charalambopoulos can take Holden's deposition; and Charalambopoulos already has his polygraph examiners (Park and Morris) to support their reports.

Charalambopoulos responds that he will be prejudiced if the court permits Holden to testify as an affirmative expert in Grammer's case-in-chief because he will have to take Holden's deposition; he will have to hire additional polygraph examiners and experts to rebut Holden's testimony; he will have to petition the court to extend the deadlines to designate such experts as rebuttal experts; and he would most likely have to undergo another polygraph to confirm the results of the first and to rebut any affirmative testimony by Holden. Charalambopoulos maintains that granting Grammer's motion will result in additional delay and will significantly increase the expense of prosecuting his claims, and that this prejudice cannot be cured by a continuance.

Grammer replies that, although Holden was available to be deposed in May 2016, Charalambopoulos elected not to depose him during the discovery period.  Nonetheless, Grammer states that she "would not oppose Plaintiff taking Holden's deposition outside of the discovery period should the Court grant Grammer's [motion]."  P. 6/24/16 Reply 8.  She disputes that Charalambopoulos will have to undergo another polygraph examination,

contending that she seeks to offer Holden's testimony only to demonstrate the irregularities and dubious circumstances surrounding the polygraph examinations that Park and Morris administered in November 2013, and that Charalambopoulos then used to defame Grammer and procure a no bill.    Finally, Grammer contends that there is ample time for Charalambopoulos to depose Holden before trial, which has now been set for the two-week docket of December 4, 2017,[5] and that no continuance is necessary.

2

The court concludes that the last two factors weigh in favor of granting the motion. As the court explained in *Hoffman v. L & M Arts*, 2013 WL 81578, at *2 (N.D. Tex. Jan. 8, 2013) (Fitzwater, C.J.):

> [i]n the sense relevant here, prejudice arises, if at all, from the *timing* of the disclosure rather than from the *content* of the disclosure.   If prejudice could be demonstrated based on the *content* of the disclosure, a party could always show prejudice when required to rebut new evidence.   The *timing* of the disclosure results in prejudice when, for instance, the opposing party must incur unreasonable additional costs that could have been avoided by an earlier disclosure, or the party is precluded under the scheduling order from developing and presenting rebuttal evidence.   Defendant[] ha[s] not shown that [he] must incur unreasonable additional costs that could have been avoided by an earlier disclosure.

*Id.* at *2.   As in *Hoffman*, Charalambopoulos points to no unreasonable additional costs or delay that will result from the *timing* of Grammer's designation of Holden as an expert for

---

[5]Grammer actually cited the December 5, 2016 trial setting that was in effect when she filed her reply.   The trial setting has since been reset to the two-week docket of December 4, 2017 for reasons unrelated to Grammer's motion.

- 11 -

her case-in-chief.  To the extent Charalambopoulos contends that delay will result from the need to depose Holden, Grammer has stated that she will not oppose Charalambopoulos' taking Holden's deposition outside of the discovery period.  Nor has Charalambopoulous established that granting Grammer's motion will require him to incur significant additional costs.  The costs he cites in his brief—i.e., the costs he will incur from deposing Holden and hiring additional polygraph examiners and experts to rebut Holden's testimony—are costs that Charalambopoulos would have incurred had Grammer timely designated Holden, and Charalambopoulos has provided no reason to conclude that he will incur any *additional* costs as a result of the delay.[6]  Finally, this case is set for trial during the two-week docket beginning December 4, 2017.  There is no indication that, if the court grants Grammer's motion, Charalambopoulos will be unable to obtain any additional discovery he requires well in advance of that trial date, or that a continuance will be necessary to cure any alleged prejudice.

## F

The court now considers the four factors holistically.  "It does not mechanically count the number of factors that favor each side."  *Serv. Temps, Inc.*, 2009 WL 3294863, at *3.  Assessing the factors as a whole, the court holds that Grammer has met the good cause

---

[6]Nor can the court see any reason why permitting Grammer to designate Holden as an affirmative expert (as opposed to a rebuttal expert) will necessitate Charalambopoulos' undergoing an additional polygraph examination.  Grammer intends to challenge the methodology that Park and Morris used in administering the polygraph examinations; Charalambopoulos should be able to respond to Grammer's challenge without undergoing an additional polygraph examination.

standard for modifying the Scheduling Order.  Although Grammer has failed to address why she did not promptly move to amend the Scheduling Order after she deposed Park and Morris, she has established good cause for failing to designate Holden as an affirmative expert by the October 1, 2015 deadline, and she has shown that Holden's affirmative expert testimony is important to her case-in-chief.  Additionally, Charalambopoulos has failed to show that he will be materially prejudiced by Grammer's re-designating Holden as an affirmative expert.

## G

Accordingly, the court grants Grammer's motion.  She may re-designate Holden as an affirmative expert in support of her case-in-chief on the condition that she permits Charalambopoulos to take Holden's deposition.  Charalambopoulos must notify Grammer of this request within 28 days of the date this memorandum opinion and order is filed.

## III

Grammer moves to strike Charalambopoulos' designation of Dr. Ramirez as an expert. Dr. Ramirez performed Grammer's October 11, 2013 surgery to treat endometrial and uterine cancer.  On October 16, 2013, several hours after Charalambopoulos allegedly assaulted Grammer, Dr. Ramirez examined Grammer.

## A

Grammer contends that Charalambopoulos' attempt to designate Dr. Ramirez as an expert in his second amended Fed. R. Civ. P. 26(a) disclosures—which he filed on the day of Dr. Ramirez's deposition (which coincided with the close of discovery), over seven

months after the deadline to designate affirmative experts—is untimely and otherwise improper and should be stricken.   In his response to Grammer's motion to strike, Charalambopoulos addresses the four factors that this court considers when deciding a motion to amend a scheduling order, even though Charalambopoulos does not explicitly move to amend the Scheduling Order to permit him to designate Dr. Ramirez.   Because Charalambopoulos has adequately addressed the four factors, the court will treat his response as if he had moved to amend the Scheduling Order to permit him to designate Dr. Ramirez, and it will address the four factors outlined above: "(1) the explanation for the failure to identify the witness, (2) the importance of the testimony, (3) the potential prejudice in allowing the testimony, and (4) the availability of a continuance to cure such prejudice." *Wright*, 2001 WL 804529, at *2.

B

The court begins with the first factor: Charalambopoulos' explanation for failing to designate Dr. Ramirez by the October 1, 2015 deadline.

1

Charalambopoulos contends that, during Dr. Ramirez's June 15, 2016 deposition, he opined for the first time that Grammer's injuries were inconsistent with abuse; that, on that same day, based on this newly disclosed opinion, Charalambopoulos designated Dr. Ramirez as a possible expert to testify as to Grammer's injuries and the opinions Dr. Ramirez gave in his deposition; and that Charalambopoulos did not intentionally delay designating Dr. Ramirez, but "merely learned of new opinions Dr. Ramirez had not previously disclosed and

immediately designated him as an expert."  P. 8/25/16 Br. 2.

Grammer responds that, based on the development of discovery in this case, Charalambopoulos would have had sufficient knowledge by August 28, 2014, at the latest, either to designate Dr. Ramirez as a combined fact/expert witness or to notice his deposition once general discovery commenced in the case in May 2015.  Grammer contends that, although Charalambopoulos' counsel may not have heard Dr. Ramirez testify until June 15, 2016, this does not justify Charalambopoulos' designation seven months after the deadline because it does not explain or address *why* Charalambopoulos did not attempt to discover Dr. Ramirez's testimony before that time.

2

The court concludes that Charalambopoulos has failed to show good cause for his delay in designating Dr. Ramirez.  Although the discovery of new evidence during a deposition often justifies amending the scheduling order to enable the parties to address this newly-discovered evidence—in fact, as discussed above, the discovery of new evidence has provided "good cause" for the late re-designation of Grammer's expert, Holden—Charalambopoulos does not offer any reason for waiting until the last day of the discovery period (over eight months after the deadline for designating expert witnesses) to depose Dr. Ramirez.  Grammer has adduced evidence that, by August 28, 2014, Charalambopoulos' attorney had obtained the Houston Police Department file of its investigation of the Alleged Assault, and that the file included an audio recording of Officer Bertha Massie's ("Officer Massie's") interview of Dr. Ramirez, Officer Massie's write-up

- 15 -

of the interview, and Dr. Ramirez's notes from his examination of Grammer on October 16, 2013, just hours after the Alleged Assault.  Having this information in their possession, it would have been reasonable for Charalambopoulos' counsel to diligently pursue deposition or other testimony from Dr. Ramirez so that Charalambopoulos could determine before the October 1, 2015 deadline whether he wanted to designate Dr. Ramirez as an expert.  The court concludes that Charalambopoulos has not shown good cause for the delay.

C

The second factor considers the importance of Dr. Ramirez's testimony.

1

Charalambopoulos contends that Dr. Ramirez's testimony is "crucial" to his case because, as the physician who treated Grammer within hours of the Alleged Assault, Dr. Ramirez is in the best position to opine on the cause of Grammer's injuries.  P. 8/25/16 Br. 3.

Grammer responds that Dr. Ramirez's expert testimony is not important because Charalambopoulos has designated Dr. Gruszecki, a forensic pathologist, to testify regarding the injuries that Grammer allegedly sustained; "[t]he ability to offer proof 'through other witnesses and medical records' is evidence that Dr. Ramirez's expert testimony is not important to Plaintiffs's case, since the topic of that purported expertise is already subsumed in that of an expert specially retained by Plaintiff," D. 7/14/16 Br. 3 (citation omitted); and Charalambopoulos has not provided any reason why he requires Dr. Ramirez's expert opinions on a subject for which he has already designated a retained expert.

2

The court concludes that Charalambopoulos has not shown that he needs Dr. Ramirez's expert testimony to prove that he did not assault Grammer.  First, he can call Dr. Ramirez as fact witness to testify about the medical care he provided Grammer.[7]  Second, he has designated Dr. Gruszecki to provide expert testimony "regarding the alleged injuries sustained by Grammer during the alleged October 16, 2013 assault," and to opine that "[Charalambopoulos] did not assault Grammer, and the bruises presented by Grammer on her wrists/forearms are consistent with those sustained when she assaulted [Charalambopoulos], or from the medical treatment she received at M.D. Anderson."  D. 7/14/16 App. 43.  Under these circumstances, the court concludes that the importance of the testimony is either neutral or weighs against granting leave.

_____

[7]Although the court has not located any controlling Fifth Circuit authority,

> in the Eleventh Circuit, treating physicians who are not
> designated as experts may offer 'lay' testimony that implicates
> their specialized experience as a physician if the testimony is an
> account of their observations during the course of treatment or
> if it is offered for the purpose of explaining the physician's
> decision-making process or the treatment provided.

*Eberhart v. Novartis Pharms. Corp.*, 867 F.Supp.2d 1241, 1252-53 (N.D. Ga. 2011) (citing *United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005)).  The court therefore concludes that Dr. Ramirez can testify as a non-expert about his observations during the course of treating Grammer and for the purpose of explaining his decision-making process or the treatment provided.  The availability of this fact testimony, in combination with Dr. Gruszecki's expert testimony, eliminates the need for Dr. Ramirez's expert testimony.

D

The court now turns to the potential prejudice in allowing Charalambopoulos to designate Dr. Ramirez.

1

Charalambopoulos contends that Grammer will not be prejudiced or even unfairly surprised by the designation of Dr. Ramirez because Grammer knows exactly what Dr. Ramirez may testify to, considering that she also designated Dr. Ramirez as an expert witness regarding her alleged injuries. Grammer responds that because her counsel had not been apprised that Charalambopoulos would try to proffer Dr. Ramirez as an expert until the day of Dr. Ramirez's deposition, he was denied the opportunity to know what Dr. Ramirez's opinions would be in advance of his deposition, and thus could not fully equip himself to explore these opinions.

2

The court concludes that this factor weighs in favor of granting leave. Grammer contends that her counsel was inadequately prepared for Dr. Ramirez's deposition and had to question him "on the fly," D. 7/14/16 Br. 4, because of Charalampoulous' late designation. But she does not contend that her counsel was unable to elicit the testimony he needed as a result. Nor does she maintain that the late designation of Dr. Ramirez will require her to conduct additional discovery or will delay the trial.

E

The court next considers the availability of a continuance to cure any prejudice. Charalambopoulos does not address this factor, and Grammer contends that it is neutral. The court accordingly assumes *arguendo* that the last factor is neutral.

F

Considering the four factors holistically, the court concludes that Charalambopoulos has not demonstrated good cause to modify the Scheduling Order to permit the late designation of Dr. Ramirez as an expert witness. Charalambopoulos has failed to offer a satisfactory explanation for not timely designating Dr. Ramirez, and his characterization of Dr. Ramirez's testimony as "crucial" largely ignores the substantially similar testimony that he will be able to obtain through a combination of Dr. Ramirez's testimony as a fact witness and the expert opinion testimony of Dr. Gruszecki, a forensic pathologist.

Although the court has concluded that Grammer has not demonstrated undue prejudice, this does not effectively end the court's analysis. As this court has previously explained:

> If the absence of undue prejudice or the availability of a continuance to cure such prejudice were alone determinative, the Rule 16(b)(4) standard would not be one of "good cause"; it would be an "absence of incurable prejudice" standard. A moving party who, for example, had shown a complete lack of diligence and who undoubtedly could reasonably have met the scheduling deadline would still be able to obtain an amended scheduling order merely by demonstrating that the opposing party would not be prejudiced. But the standard is "good cause," and the good cause standard focuses on the diligence of the party seeking to modify the scheduling order. Courts deny

> motions to amend the scheduling order when the moving party
> fails to demonstrate that, despite her diligence, she could not
> have reasonably met the scheduling deadline.

*Matamoros v. Cooper Clinic*, 2015 WL 4713201, at *3 (N.D. Tex. Aug. 7, 2015) (Fitzwater, J.) (citation omitted).

In the present case, the discovery stay was lifted on May 22, 2015.  At that point, Charalambopoulos' counsel had in their possession documents showing that Dr. Ramirez had examined Grammer hours after the Alleged Assault.  In fact, Charalambopolous identified Dr. Ramirez as an individual likely to have discoverable information in his September 15, 2014 initial disclosures.  Charalambopoulos provides no explanation for his failure to depose Dr. Ramirez until the last day of the discovery period.  Nor does he show that, exercising reasonable diligence, he could not have determined what Dr. Ramirez's opinions were or that Dr. Ramirez should have been designated as an expert by the October 1, 2015 deadline.  In deciding whether to permit the late expert designation, the court must take all four factors into consideration.  Evaluating the factors holistically, the court concludes that they weigh against permitting Charalambopoulos to make this late designation.  Accordingly, treating the pending motion as a motion for leave to amend the Scheduling Order, the court finds that Charalambopoulos has failed to demonstrate good cause for doing so, and, accordingly, denies the motion.

IV

Grammer moves to bifurcate trial of the amount of exemplary damages.  She requests

> that the Court bifurcate the trial of this action so that the
> determination, if necessary, of the amount of any exemplary
> damages to be awarded to [Charalambopoulos] can be held in a
> second phase of trial, and only after the Court determines that
> there is any legal basis for an award of exemplary damages to
> [Charalambopoulos] based on the findings of the jury in the first
> phase of the trial, and for such other relief to which Grammer
> may be entitled.

D. 7/13/16 Br. 4.

The decision whether to bifurcate a trial "is primarily procedural in nature and . . .

federal procedural law controls."  *Rosales v. Honda Motor Co.*, 726 F.2d 259, 260 (5th Cir.

1984).  Rule 42(b) provides that a court may bifurcate any claim or separate issue in a trial

in order to promote convenience or to avoid prejudice.  The decision to bifurcate the damages

and liability portions of a trial under Rule 42(b) is a matter within the sound discretion of the

trial court.  *See Rosales*, 726 F.2d at 260.

Charalambopoulos does not oppose Grammer's motion.  Accordingly, the motion to

bifurcate is granted.

V

The court now turns to Grammer's *Daubert*[8] motions.  "The court decides these

motions in its role as gatekeeper under Fed. R. Evid. 702."  *Johnson v. BAE Sys. Land &*

*Armaments, L.P.*, 2014 WL 1714487, at *25 (N.D. Tex. Apr. 30, 2014) (Fitzwater, C.J.)

---

[8]*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

(citations omitted).  "The court may admit proffered expert testimony only if the proponent, who bears the burden of proof, demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable."  *Nunn v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 2540754, at *2 (N.D. Tex. June 22, 2010) (Fitzwater, C.J.) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).

The first requirement is that the expert be qualified.  "Before a district court may allow a witness to testify as an expert, it must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009) (quoting Fed. R. Evid. 702).  "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject."  *Id.* (citing *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)).  "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue.  Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."  *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (citation omitted).

The second requirement is that the expert's testimony be relevant.  To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'"  *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993)).  "Relevance depends upon 'whether [the expert's] reasoning or methodology properly can be applied to the facts in issue.'"  *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting

*Daubert*, 509 U.S. at 593); *see also* Rule 702(d) (requiring that "expert has reliably applied the principles and methods to the facts of the case").

The third requirement is that the expert's testimony be reliable. "Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Knight*, 482 F.3d at 352 (quoting *Daubert*, 509 U.S. at 592-93); *see also* Rule 702(c) (requiring that "testimony [be] the product of reliable principles and methods"). Expert testimony "must constitute 'more than subjective belief or unsupported speculation.'" *Nunn*, 2010 WL 2540754, at *2 (quoting *Daubert*, 509 U.S. at 590). The court focuses on the expert's methodology, not the conclusions generated by it. *Id.* at *4 (citing *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997)). If, however, "there is simply too great an analytical gap between the [basis for the expert opinion] and the opinion proffered," the court may exclude the testimony as unreliable. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Johnson v. Arkema, Inc.*, 685 F.3d 452, 460-61 (5th Cir. 2012). This review is usually conducted by considering the five nonexclusive *Daubert* factors.[9] But these factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of [the] testimony." *Kumho*, 526 U.S. at 150.

---

[9]The five nonexclusive *Daubert* factors are: (1) whether the expert's technique can be or has been tested; (2) whether the method has been subjected to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-94.

The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n.10; *see also Johnson*, 685 F.3d at 459. The court's inquiry is flexible in that "[t]he relevance and reliability of expert testimony turns upon its nature and the purpose for which its proponent offers it." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (citation omitted). "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [trier of fact's] consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *Nunn*, 2010 WL 2540754, at *4.

## VI

The court begins with Grammer's motion to strike Francis, Charalambopoulos' rebuttal expert, and to strike the re-designation of Francis as an affirmative expert.

## A

Charalambopoulos is suing Grammer for defamation and malicious prosecution, alleging, *inter alia*, that Grammer falsely accused him of assaulting her. To prove the falsity of Grammer's accusations, Charalambopoulos intends to rely, in part, on a Texas grand jury's decision not to indict him on criminal charges. Although Grammer disputes the admissibility of the grand jury's decision to return a no bill, she has proffered the testimony and opinions of George M. Secrest, Jr., Esquire ("Secrest"), a Texas criminal attorney, to

- 24 -

provide background information on the grand jury process and the legal implications of the grand jury's decision to return a no bill.[10]  Secrest has offered no opinion on why the grand jury may have decided not to indict Charalambopoulos.

Charalambopoulos has designated Francis, who has over twenty years of criminal law experience as a prosecutor, judge, and defense attorney, as a rebuttal expert.  In her rebuttal Expert Report ("Francis Report"), Francis states that, in her experience, due to the low threshold standard of probable cause and other reasons discussed in the Francis Report, family violence cases are rarely, if ever, no billed; that having an actual complaining witness testify on a contested family violence case "is unheard of," D. 7/15/16 App. 22; and that

> [b]y definition then and after [Grammer] testified, the resulting NO-BILL on [Grammer's] Family Violence allegations meant that this low threshold of Probable Cause was NOT reached by the Grand Jury.  Thus, whatever was said by [Grammer] to the Grand Jury (and likely under oath) must have been highly suspect, against the great weight of the evidence and common sense or inconsistent with the truth.  Based on my experience, there is no other realistic explanation.

*Id.* at 23.

Grammer moves to exclude Francis' testimony on six grounds,[11] each of which the

---

[10]Secrest opines in his Expert Report ("Secrest Report") that, under Texas law, the "lack of probable cause" element of a malicious prosecution claim turns on the complainant's belief rather than a grand jury's assessment of probable cause, and there are a number of reasons—apart from the prosecution's failure to establish probable cause—why a grand jury might choose to return a no bill.

[11]Grammer contends that (1) Francis' testimony is not relevant to any issue in this case; (2) Francis' opinions on the grand jurors' states of mind and Grammer's credibility are not the proper subject of expert testimony; (3) grand jury proceedings are secret, and to protect the integrity of these proceedings, the court should exercise its inherent power to

court addresses below.

## B

### 1

Grammer generally contends that a grand jury's no bill is not relevant to the probable cause element of a malicious prosecution claim or any other contested issue in this case.  She maintains that, "[b]ecause the grand jury decision itself is not relevant, Francis's testimony about the grand jury—which is even further removed insofar as it requires her to speculate that the grand jurors concluded there was not probable cause to indict—is not relevant either."  D. 7/15/16 Br. 8.  Grammer also posits that Francis' opinion is unreliable because, *inter alia*, Francis was not privy to the secret grand jury deliberations, so her conclusion regarding why the grand jury no billed Charalambopoulos is speculative.  Finally, Grammer contends that Francis' testimony goes beyond the proper role of an expert and invades the province of the jury because she offers assessments of witness credibility (by opining that Grammer's grand jury testimony was not credible) and opinions on state of mind (specifically, the grand jurors' states of mind that Grammer was not credible and that probable cause did not exist to pursue the case against Charalambopoulos).

Charalambopoulos responds to Grammer's relevance argument by contending that

───────────────────

exclude Francis' speculative testimony on the proceedings at issue here; (4) Francis' speculative testimony fails Rule 702's reliability requirement; (5) Francis is not qualified as an expert on grand jury decision-making; and (6) Francis' testimony is not proper rebuttal testimony, and Charalambopoulos' untimely effort to re-designate her as an affirmative expert is improper.

"Francis' testimony is relevant to the extent this Court decides to allow Secrest to testify about the grand jury process." P. 8/25/16 Br. 3. He contends that Francis' opinions about the grand jury proceedings are reliable because they "are deductions based on what Francis knew and observed, not simply 'speculative' supposition." *Id.* at 5.

2

Under Rule 702, an expert's can testify for the purpose of educating the jurors about general principles that are pertinent to the case. *See, e.g., Strauss Farms, Inc. v. Combs Commodities, Inc.*, 2005 WL 946523, at *3 (D. Kan. Mar. 29, 2005) (allowing testimony about nature of spontaneous combustion of cottonseed without applying theory to fire at issue in case).

> [I]t might also be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case. For example, experts might instruct the factfinder on the principles of thermodynamics, or bloodclotting, or on how financial markets respond to corporate reports, without ever knowing about or trying to tie their testimony into the facts of the case. The amendment does not alter the venerable practice of using expert testimony to educate the factfinder on general principles.

Fed. R. Evid. 702 advisory committee's note. When an expert testifies to educate the factfinder on general principles, "Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony 'fit' the facts of the case." *Id.* The second and fourth requirements merely state that an expert's testimony must be relevant.

*See Miller v. Holzmann*, 563 F.Supp.2d 54, 91-92 (D.D.C. 2008) (citing *Daubert*, 509 U.S. at 591).  If an expert distills a complicated subject into language a jury can understand, and that subject is relevant, she can be admitted as a "teaching witness."  *See id.* at 94.

But "[t]estimony is irrelevant . . . when an expert offers a conclusion based on assumptions unsupported by the facts of the case."  *Rolls-Royce Corp. v. Heros, Inc.*, 2010 WL 184313, at *6 (N.D. Tex. Jan. 14, 2010) (Fitzwater, C.J.).  An opinion is unhelpful to a trier of fact if it attempts to apply a general observation about a larger group to particular individuals whose conduct is in question.  *See Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 2003 WL 22272587, at *7 (S.D.N.Y. Oct. 2, 2003) (holding that opinion about discrimination in concert promotion industry was not relevant to issues in plaintiffs' case because case concerned conduct of booking agencies and promoters toward other promoters, not the industry at large, and the evidence would only inject unfair prejudice).  And where "there is simply too great an analytical gap between the [basis for the expert opinion] and the opinion proffered," the court may exclude the testimony as unreliable.  *Gen. Elec. Co.*, 522 U.S. at 146.

3

Francis' opinion that the grand jury's return of a no bill means that the grand jury concluded that there was no probable cause and that Grammer's grand jury testimony "must have been highly suspect, against the great weight of the evidence and common sense or inconsistent with the truth," D. 7/15/16 App. 23, is neither relevant nor reliable and is excluded.  As the court has explained above, to be admitted, Francis' testimony must be

"more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.  Francis opines that, in her experience, having a complaining witness testify on a contested family violence case is unheard of.  She then opines that "[t]he only reason that [she] can think of where this live testimony would occur would be that the Grand Jury had significant concerns about the truthfulness or credibility of the Complaining Witness."  D. 7/15/16 App. 22.  But her conclusion rests on pure speculation.  Nor does she provide any basis for her opinion that Grammer's grand jury testimony lacked credibility, or that the grand jury's return of a no bill means that it concluded that the "low threshold of Probable Cause was NOT reached."  *Id.* at 23.  Because Francis was not privy to the secret grand jury proceedings in this case, any conclusion she has reached about why the grand jury may have made a particular decision is necessarily based on speculation.  In other words, "there is simply too great an analytical gap between the [basis for the expert opinion] and the opinion proffered."  *Gen. Elec. Co.*, 522 U.S. at 146.

Accordingly, the court grants Grammer's motion to the extent of excluding Francis' opinion that the grand jury had significant concerns about Grammer's credibility, that the grand jury concluded that Grammer's testimony lacked credibility, or that the grand jury returned a no bill because it found that there was no probable cause.  Although the court is excluding these parts of Francis' proposed testimony, Charalambopoulos will be permitted to call Francis as a rebuttal "teaching witness" about the grand jury process to offer background information relevant to the claims in this case.

4

Alternatively, the court excludes Francis' opinions that the grand jury had significant concerns about Grammer's credibility, that the grand jury concluded that Grammer's testimony lacked credibility, and that the grand jury returned a no bill because it found that there was no probable cause, because it concludes that such expert testimony goes beyond the proper role of an expert and invades the province of the jury.[12]

An expert may not offer opinions that simply reiterate what "the lawyers can offer in argument." *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992); *see also In re Air Crash Disaster at New Orleans*, 795 F.2d 1230, 1233 (5th Cir. 1986) ("[T]he trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument."). Nor should an expert be permitted to draw conclusions about another's state of mind. *See United States ex rel. Ruscher v. Omnicare, Inc.*, 2015 WL 5178074, at *6, *11 (S.D. Tex. Sept. 3, 2015) (an expert "will not be permitted to testify about . . . intent, motive, or state of mind, as that is typically held to be within the province of the jury"); *Estate of Davis v. City of N. Richland Hills*, 2007 WL 628090, at *3 (N.D. Tex. Feb. 28, 2007) (Means, J.) ("While it may be reasonably inferred based on the evidence surrounding the shooting that Hill was startled when he encountered Troy Davis and that he subsequently fired his gun on

---

[12]Grammer contends that Francis' testimony exceeds the proper role of an expert and invades the province of the jury because she offers assessments of witness credibility (by opining that Grammer's grand jury testimony was not credible) and opinions on state of mind (that the grand jurors found that Grammer was not credible and that probable cause did not exist to pursue the case against Charalambopoulos). Charalambopoulos does not specifically respond to this argument.

impulse, the Court concludes that Hueske's expert opinion regarding Hill's state of mind and Hill's action based on his state of mind crosses the line from assisting the jury in understanding the evidence and determining a fact in issue to evading the province of the jury.").  Consequently, "a trial court may strike expert testimony that evaluates a party's state of mind, as that evaluation is within the province of the jury." *Fisher v. Halliburton*, 2009 WL 5216949, at *2 (S.D. Tex. Dec. 21, 2009).

Here, Francis opines about why the grand jury returned a no bill and what the grand jurors "must have" concluded about Grammer's credibility, and she speculates about why Grammer was called to testify before the grand jury.  None of these opinions, which represent Francis' speculation about the states of mind of the individual grand jurors, is the proper subject of expert testimony.  Accordingly, for this additional reason, Francis' expert opinions on these topics are excluded.[13]

C

1

Grammer contends that Francis is not qualified as an expert on grand jury decision-making in family violence cases: she was not among the prosecutors specifically tasked with presenting cases to grand juries; on the few occasions when she did "present" to a grand jury,

---

[13]Grammer contends that the court should exercise its inherent power to exclude Francis' testimony in order to protect the integrity of grand jury proceedings.  Because the court is excluding Francis' opinions regarding Grammer's credibility and the reasons why the grand jury returned a no bill in Charalambopoulos' criminal case, it need not decide whether to exercise its inherent power to exclude Francis' testimony.

she was merely called to aid the prosecutor; during Francis' 15 months on the bench, she empaneled only one grand jury and did not have significant contact with it after it was empaneled; as criminal defense counsel, she could not appear before the grand jury; she has not conducted any studies on grand juries or reviewed any relevant literature; she has never presented a family violence case to a grand jury; she has not looked at statistics comparing the frequency of no bills in family violence cases with other types of cases; she has not spoken to the single prosecutor tasked with taking family violence cases to the grand jury in Dallas; and she bases her opinion that family violence cases are handled more thoroughly in grand jury proceedings than other types of cases on the fact that none of her family violence clients has been no billed.

Charalambopoulos responds that Francis' experience qualifies her as an expert to render opinions about the grand jury process.  He maintains that

> Francis started her career as a prosecutor with the Dallas County District Attorney's Office in February 1995. During her ten years with the Dallas County DA's office, she handled thousands of cases ranging from misdemeanor offenses to capital murders and tried over a hundred felony cases. During her tenure with the office, she was assigned to the Child Abuse Division, Organized Crime Division, was the legislative liaison for the office and was the felony chief prosecutor in Criminal District Court #4 before being appointed by Governor Perry to a criminal district bench in Dallas County in September 2005. As presiding judge of Criminal District Court #7, Francis presided over hundreds of felony cases. She handled pleas, hearings, bench trials and jury trials during her time on the bench.
>
> In January 2007, Francis went back to the Dallas County DA's Office as an administrative chief.  She was head of the misdemeanor division where she supervised 35 assistant district

attorneys, 13 legal assistants, and 3 investigators.  It was her responsibility to train the new attorneys employed by the office. She held this position until leaving the office in December 2010.

P. 8/25/16 Br. 3-4.

2

"Whether an individual is qualified to testify as an expert is a question of law." *Rolls-Royce Corp.*, 2010 WL 184313, at *4 (quoting *Huss*, 571 F.3d at 452).  "Under Rule 702 a witness can be qualified as an expert due to [her] knowledge, skill, experience, training, or education." *Am. Tourmaline Fields v. Int'l Paper Co.*, 1999 WL 242690, at *2 n.5 (N.D. Tex. Apr. 19, 1999) (Fitzwater, J.).  "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue.  Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Rolls-Royce Corp.*, 2010 WL 184313, at *4 (quoting *Huss*, 571 F.3d at 452).

The court concludes that Francis' more than 20 years' experience in the field of criminal law—including as a prosecutor, defense attorney, and judge—renders her qualified to opine on grand jury proceedings, in general.  To the extent Grammer contends that Francis is unqualified to testify as an expert regarding grand jury proceedings in family violence cases, the court concludes that Grammer's specific challenges go to the weight of Francis' testimony, not its admissibility.  "[Q]uestions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [trier of fact's] consideration." *Viterbo*, 826 F.2d at 422.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden

of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.  Any deficiencies in Francis' conclusions as a result of her lack of personal experience or failure to consider statistical or other evidence can be attacked at trial through the same means.  Accordingly, the court denies Grammer's motion to exclude Francis on the basis that she is unqualified.

D

Grammer contends that Francis' testimony on both issues for which it is proffered—the grand jury and attorney's fees—is not proper rebuttal testimony and must be excluded.  Charalambopoulos has not responded to this ground of Grammer's motion.

1

This court has previously stated that it "will often be helpful to answer . . . three questions" in assessing whether proffered evidence is rebuttal evidence:

> First, what evidence does the rebuttal expert purport to contradict or rebut?  Second, is the evidence disclosed as rebuttal evidence on the same subject matter as that identified by another party in its Rule 26(a)(2)(B) disclosure?  Third, is the evidence disclosed as rebuttal evidence intended solely to contradict or rebut that evidence?

*Wireless Agents, L.L.C. v. Sony Ericsson Mobile Commc'ns AB*, 2006 WL 5127278, at *2 (N.D. Tex. May 31, 2006) (Fitzwater, J) (quoting *Poly-Am., Inc. v. Serrot Int'l, Inc.*, 2002 WL 1996561, at *15 (N.D. Tex. Aug. 26, 2002) (Fitzwater, J.)).  Accordingly, to determine whether Francis is offering permissible rebuttal expert opinions, the court asks whether she is purporting to contradict or rebut expert opinions offered by Grammer as to a claim or

- 34 -

defense as to which Grammer will have the burden of proof at trial; whether her evidence is disclosed as rebuttal evidence on the same subject matter as that identified by Grammer in her Rule 26(a)(2)(B) disclosure; and whether the evidence disclosed as rebuttal evidence is intended solely to contradict or rebut that evidence.  *Id.*

## 2

Grammer contends that Francis' "rebuttal" testimony on attorney's fees does not purport to contradict or rebut any of Grammer's evidence; that Francis conceded during her deposition that her testimony on attorney's fees is not rebuttal testimony, *see* D. 7/15/16 App. 68-69 ("Q.  Now, first, you would agree in rendering this opinion you are not rebutting anybody else's opinion in this case that you're aware of, correct?  You have not been shown anybody's opinion about the quantum of fees that you are responding to or rebutting?  A. No.  But I just figured since I was asked, there must have been some sort of dispute about it."); and that her testimony on attorney's fees must therefore be excluded.  The court agrees, largely for the reasons on which Grammer relies in her motion, that Francis' testimony on attorney's fees is not proper rebuttal testimony, and must therefore be excluded.

## 3

Grammer contends that Francis' "rebuttal" testimony on the grand jury proceedings fails the third question in *Wireless Agents* because she does not actually contradict or rebut any of Secrest's expert opinions.  Grammer maintains that

> Francis's report concludes the grand jury returned a no bill
> because the probable cause standard was not met. To do so, she
> considers two case-specific factors: (1) the fact the allegations
> involved family violence and (2) the fact Grammer provided live
> testimony in a high profile case. Therefore, Francis's testimony
> delving into the facts of the case does not rebut, let alone "solely
> . . . rebut," Secrest's testimony on the grand jury.

D. 7/15/16 Br. 24 (citations omitted).

The court has already excluded Francis' opinions to the extent she opines on the grand

jurors' states of mind or the reasons why the grand jury may have returned a no bill in

Charalambopoulos' case. The court declines to further exclude Francis' testimony on the

basis that it is not proper "rebuttal" testimony. Grammer has proffered Secrest to give the

jury general background information on grand jury proceedings. To the extent

Charalambopoulos intends to use Francis to provide the jury in this case with further detail

on grand jury proceedings in order to paint a more complete picture, or to rebut any of

Secrest's testimony, her testimony is properly admitted as rebuttal evidence.

E

Finally, Grammer contends that Charalambopoulos' effort to re-designate Francis as

an affirmative expert is improper. She contends that, when Charalambopoulos filed his first

amended disclosure of expert testimony on May 16, 2016, he listed Francis as an expert

without indicating that she was a rebuttal expert, and without seeking leave of court or

conferring with Grammer's counsel. Charalambopoulos has not responded to this argument.

Charalambopoulos has not moved to amend the Scheduling Order to permit him to

designate Francis as an affirmative expert. Nor does he address in his brief any of the four

factors that the court considers when deciding a motion to amend the scheduling order. Accordingly, to the extent Charalambopoulos has attempted to make an untimely re-designation of Francis as an affirmative expert without seeking leave of court, the court grants Grammer's motion to strike Charalambopoulos' re-designation of Francis as an affirmative expert.  Francis will only be permitted to provide rebuttal expert testimony at trial.

## VII

Grammer moves to strike the testimony and opinions of Collins, a "forensic expert" who opines that "the alleged assault as depicted and described by Grammer did not occur and Charalambopoulos is being truthful in his denial of assaulting Grammer."  P. 7/15/16 Br. 1 (quoting P. 7/15/16 App. 4).

## A

## 1

Grammer contends that Collins' report and testimony are not based on a reliable methodology.  She maintains that, because Collins merely looked at the "totality of the evidence" to opine that Charalambopoulos did not assault Grammer, no meaningful methodology supports Collins' opinion; by identifying inconsistencies and then looking at the "totality of the evidence" to determine whether a witness is being truthful or is lying, Collins is doing nothing more than what a juror would do, i.e., weighing the evidence and making credibility determinations; Collins' analysis of the evidence of Grammer's injuries lacks a methodological foundation since she has not engaged in any expert analysis of the

medical records and, instead, merely parrots what she has found in Dr. Ramirez's records; Collins compares the evidence of injuries to Grammer's head (largely testimonial) versus the evidence of injuries to Grammer's wrists (documented in photographs), which is something a juror could do; Collins opines that the bruises on Grammer's wrists are consistent with those she sustained when she struck Charalambopoulos, but Collins provides no specific medical or scientific evidence to support this conclusion; and Collins has not offered any methodology underlying her decision whether and in what manner to give significant weight to the Harris County grand jury's decision to no bill Charalambopoulos.

Charalambopoulos responds that Collins' opinions are the product of years of education, training, experience as a federal investigator, and her work as a forensic investigator; that an expert is entitled to reach opinions applying her experience to specific facts; and that the principles and methodologies underlying Collins' opinions include her "training and experience conducting assault investigations, which includes but is not limited to overall case management, crime scene investigations and documentation, evidence identification and collection, chain of custody, interpretation and application of forensic analysis results, and interviews."   P. 8/25/16 Br. 7 (quoting P. 8/25/16 App. 42-43). Charalambopoulos contends that Collins' training and experience conducting assault investigations provide sufficient reasoning or methodology for her to rely on in forming her opinions; that Collins applied her education, training, and experience to the facts in this case to form reliable opinions about the cause of Grammer's injuries [P. 8/25/16 Br.; that Collins is entitled to base her opinions on a different version of the facts than that offered by

Grammer; and that Collins' opinions about the alleged physical assault are reliable because they are deductions based on what Collins knew and observed, not simply "speculative" supposition. Finally, Charalambopoulos contends that the true substance of Grammer's complaint concerns the validity of the bases on which Collins' opinions rest, but that Grammer's complaint goes to the weight, not the admissibility, of Collins' testimony.

2

In deciding whether Collins used a reliable methodology in reaching her conclusions, the court analyzes the internal logic of Collins' method, "determin[ing] whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592) (second alteration in original). Collins explains in her September 30, 2015 report ("Collins Report") that her conclusion that the Alleged Assault as depicted and described by Grammer did not occur is based on her training, knowledge, and experience as a criminal investigator and forensic sciences consultant. Her methodology, as demonstrated in the Collins Report, is to review the evidence of the Alleged Assault and determine, based on her experience as a criminal investigator and forensic sciences consultant, whether there are gaps or inconsistencies in the evidence that would tend to undermine Grammer's version of the events. The court concludes that Collins' methodology is sufficiently reliable.

To the extent Grammer challenges the specific conclusions reached in Collins' Report, "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [trier of fact's]

consideration." *Viterbo*, 826 F.2d at 422.  In other words, Grammer's challenges to Collins' failure to engage in an expert analysis of the medical records, failure to provide medical or scientific evidence to support her conclusions about the bruises on Grammer's wrists, and failure to adequately explain why she gave significant weight to the grand jury's return of no bill, all go to the weight, not the admissibility, of Collins' opinions.

B

1

Grammer next contends that Collins' testimony usurps the role of the jury because Collins' opinion turns largely on the inconsistences between various witness statements, which is something the jury can understand without expert testimony.  Charalambopoulos has not specifically responded to this argument.

2

The court disagrees that, in evaluating the large amount of evidence gathered in connection with the investigation of the Alleged Assault and distilling this evidence into a format that will be useful at trial, Collins has usurped the role of the jury.  "[A]n expert can be employed if [her] testimony will be helpful to the trier of fact in understanding evidence that is simply difficult, [though] not beyond ordinary understanding."  *Total Control, Inc. v. Danaher Corp.*, 338 F.Supp.2d 566, 569 (E.D. Pa. 2004) (first and third alteration in original) (citation omitted) (rejecting contention that financial analyst's testimony should be excluded because his damage calculations were based on simple arithmetic; and finding that expert's "ability to present a vast quantity of calculations derived from disparate sources in an

understandable format will assist the jury"); *see also Gen. Elec. Capital Bus. Asset Funding Corp. v. S.A.S.E. Military Ltd.*, 2004 WL 5495588, at *5 (W.D. Tex. Oct. 6, 2004) ("Given its complexity and cumbersome nature, Stich's compilation of this information and documentation into a presentable format is 'helpful' in that it will 'assist the trier of fact to understand the evidence or to determine a fact in issue.' Further, Stich's testimony will assist the jury in extracting relevant information from the accounting documents given and will facilitate its understanding of the evidence presented."). Allowing Collins to sift through the evidence gathered in connection with the criminal investigation of the Alleged Assault, explain the relevant evidence to the jury in a format that it can more easily follow, and point out, based on her experience as a criminal investigator and forensic sciences consultant, why certain statements in the evidence are inconsistent with, or are not supported by, the physical evidence, will not usurp the role of the jury. After the jurors hear Collins' testimony, they will be able to decide for themselves whether the inconsistencies in the evidence that Collins points out are sufficient to support the conclusion that the Alleged Assault, as depicted by Grammer, did or did not occur.

C

Grammer maintains that Collins' opinion that Charalambopoulos is being truthful and that Grammer is not is impermissible testimony and should be excluded.

In the Collins Report, Collins opines that "the alleged assault as depicted and described by Grammer did not occur and Charalambopoulos is being truthful in his denial of assaulting Grammer." D. 7/15/16 App. 4. It is clearly established that expert testimony

may not usurp the jury's authority to make credibility determinations. *See, e.g., Skidmore v. Precision Printing & Pkg., Inc.*, 188 F.3d 606, 618 (5th Cir. 1999) (stating that "[c]redibility determinations, of course, fall within the jury's province" in relation to a challenge to expert testimony); *Nichols v. Am. Nat'l Ins. Co.*, 154 F.3d 875, 883 (8th Cir. 1998) ("Weighing evidence and determining credibility are tasks exclusive to the jury, and an expert should not offer an opinion about the truthfulness of witness testimony."); *Amin-Akbari v. City of Austin, Tex.*, 52 F.Supp.3d 830, 848 (W.D. Tex. 2014) ("It is for the jury to assess credibility, not an expert."); *Johnson*, 2014 WL 1714487, at *35 (noting that "expert testimony about plaintiffs' truthfulness or credibility could theoretically cross the line into inadmissibility by, for example, invading the province of the jury."). Collins' opinion that "Charalambopoulos is being truthful in his denial of assaulting Grammer" goes directly to the question of Charalambopoulos' credibility and must therefore be excluded.

Her opinion, however, that "the alleged assault as depicted and described by Grammer did not occur" does not so clearly and specifically opine about Grammer's credibility as to warrant exclusion. For example, if in the trial of an automobile accident the defendant testifies that she applied her brakes well before she entered the intersection, and the plaintiff's accident reconstruction expert testifies that the skid marks left by the defendant's car show that she did not apply her brakes until she was just about to enter the intersection, the expert's opinion may call into question the credibility of the defendant's testimony, but it is not an opinion *about* the defendant's credibility. Were the court to hold otherwise, expert opinions that had nothing to do with a witness' credibility would be excludable on the

basis that they enabled the jury to infer that the witness' testimony was not credible.

Accordingly, the court excludes that portion of Collin's expert opinion that "Charalambopoulos is being truthful in his denial of assaulting Grammer," and it declines to exclude her opinion that "the alleged assault as depicted and described by Grammer did not occur."

D

Grammer moves to exclude Collins' testimony on the basis that there is too great an analytical gap between the evidence Collins has examined and the opinions she offers. Grammer maintains that Collins makes several statements that are unsupported by the factual record; Collins relies on "numerous inconsistencies between the various statements provided by Grammer," D. 7/15/16 Br. 15, as support for her conclusion that Charalambopoulos did not assault Grammer, but, during her deposition, Collins explained that several of the inconsistencies she identified in her report had no impact on her opinion; and there is too great an analytical gap between the evidence as it stands after Collins' deposition and the opinions Collins proffers.

The court declines to exclude Collins' testimony on the basis that there is too great an analytical gap between the evidence she has examined and the opinions she proffers. To the extent Grammer objects on the basis of Collins' opinion that "Charalambopoulos is being truthful in his denial of assaulting Grammer," D. 7/15/16 App. 4, the court has already excluded this opinion. Otherwise, her objections go to the weight, not the admissibility, of this evidence.

- 43 -

E

Finally, Grammer contends that Collins is not qualified to testify on grand jury results, relationships, and normal sexual activity. She maintains that Collins' reliance on the Harris County grand jury's decision to no bill Charalambopoulos is a purely legal question that does not implicate Collins' purported "scientific" expertise. Grammer posits that

> Collins points to text messages expressing Grammer's love and appreciation for [Charalambopoulos], as well as [Charalambopoulos'] allegations that he and Grammer engaged in "consensual sexual contact several times during [Charalambopoulos'] visit." However, Collins conceded that she is not qualified as an expert on how engaging in sexual activity impacts or is impacted by relationship issues between couples. Accordingly, to the extent Collins intends to opine based on the text messages and sexual activity between [Charalambopoulos] and Grammer, the court must exclude her testimony for the additional reason that she lacks expert qualifications to opine about them.

D. 7/15/16 Br. 18-19 (citations omitted).

Charalambopoulos responds that Collins is qualified as an expert in forensic science, and he lists Collins' qualifications, but he does not specifically respond to Grammer's argument that Collins is not qualified to testify on grand jury results or on how engaging in sexual activity impacts or is impacted by relationship issues between couples. And during her deposition, Collins conceded that she lacks education and training in grand jury practice and grand jury law, and that she is not qualified to render an opinion on what would be considered normal sexual contact between two people. Accordingly, because neither Charalambopoulos nor Collins appears to maintain that Collins is qualified to render an

- 44 -

expert opinion on these topics, the court grants Grammer's motion to the extent of excluding Collins' testimony regarding the grand jury's return of a no bill, Grammer's text messages expressing her love for Charalambopoulos, and the sexual activity between Grammer and Charalambopoulos.

## VIII

The court next considers Grammer's motion to strike the expert testimony of Browning.

## A

Charalambopoulos has designated Browning, an attorney with experience "in the area of social media and the law," D. 7/15/16 App. 4, to testify on "the impact that statements made online and particularly via social media can have on an individual's reputation," *id.* at 3. Grammer moves to exclude Browning on the basis that his testimony regarding "the mere fact of damage" is not relevant because nominal damages are presumed in a defamation *per se* case, and Browning is unable to testify on the *degree* of Charalambopoulos' reputational harm, D. 7/15/16 Br. 4; his testimony on damages components that Charalambopoulos has omitted from his second amended complaint is not relevant; his "expert" statements amount to nothing more than uncontroversial common knowledge; and Browning lacks the necessary expertise to provide expert testimony on the effect online statements will have on Charalambopoulos' interpersonal relationships or ability to earn a living.

B

The court concludes that Browning's expert testimony is relevant.  In his response to Grammer's motion, Charalambopoulos contends that Browning's testimony is "relevant to the damages Charalambopoulos and his reputation sustained as a result" of Grammer's conduct.  P. 8/25/16 Br. 3.  In his second amended complaint, Charalambopoulos alleges claims for defamation and defamation per se.  To recover on his defamation claim, Charalambopoulos will have to prove the fact of damages.  *See Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 580 (Tex. App. 2007, pet. denied) ("Statements that are defamatory per quod are actionable only upon allegation and proof of damages.  Thus, before a plaintiff can recover for defamation per quod, the plaintiff must carry his burden of proof on both the existence of and amount of damages." (citations omitted)).  And although Charalambopoulos can recover on his defamation per se claim without specific proof of the existence of harm, *see, e.g., Bentley v. Bunton*, 94 S.W.3d 561, 604 (Tex. 2002) ("Our law presumes that statements that are defamatory per se injure the victim's reputation and entitle him to recover general damages, including damages for loss of reputation and mental anguish."), in order to recover more than nominal damages, Charalambopoulos must prove the amount of his damages, *see In re Lipsky*, 460 S.W.3d 593 (Tex. 2015) ("[E]ven though Texas law presumes general damages when the defamation is per se, it does not 'presume any particular amount of damages beyond nominal damages.'" (quoting *Salinas v. Salinas*, 365 S.W.3d 318, 320 (Tex. 2012) (per curiam)).

Browning's expert testimony regarding the effect that Grammer's public statements

have had on Charalambopoulos' reputation will clearly be relevant to the jury's finding of damages in connection with Charalambopoulos' defamation claim (assuming that Charalambopoulos prevails on this claim at trial) and to the jury's assessment of the amount of damages in connection with Charalambopoulos' claims for defamation and for defamation per se.[14]  Browning's failure to opine on the precise amount of damages Charalambopoulos should be awarded does not render his opinion on the fact and extent of damages irrelevant.

C

Grammer contends that, to the extent Browning intends to testify regarding components of Charalambopoulos' damages that he omitted from his second amended complaint (i.e., damage to future employment opportunities, damage to credibility amongst clients and business associates, economic damages sustained in past and future, and loss of future earning capacity), this testimony is irrelevant, and Charalambopoulos "should not be permitted to bring in evidence through the back door, under the auspices of Browning's expert testimony, on these now-abandoned components of his damages claim."  D. 7/15/16 Br. 6.  Charalambopoulos has not responded to this argument.

The court agrees that Charalambopoulos cannot use Browning's expert testimony to recover damages that he has omitted from his second amended complaint and no longer seeks.  Accordingly, to the extent that Charalambopoulos intends to offer Browning's expert

---

[14]To the extent Grammer criticizes Browning's failure to conduct a survey or any interviews, and his failure to assess Charalambopoulos' reputation prior to the Alleged Assault and any related online postings, Grammer's objection goes to the weight, not the admissibility, of the evidence.

testimony at trial on a matter that is only relevant to an element of damages that has been dropped, and not otherwise relevant, the court excludes the testimony.

D

Grammer contends that Browning's testimony will not assist the jury because it concerns matters of common knowledge. She maintains that Browning's expert report "overflows with 'expert' statements that amount to no more than uncontroversial common knowledge," D. 7/15/16 Br. 8; that Browning offers no explanations as to how or why a lay juror cannot evaluate whether, or the degree to which, a statement circulated to 198,000 Twitter followers has the potential to cause reputational damage; that jurors can determine for themselves whether stories about domestic violence will harm the alleged batterer's reputation, without an expert on social media and the law telling them so; that Browning's discussion of specific articles and the number of social media followers is nothing more than fact testimony masquerading as expert testimony; that running a basic Google name search does not require any specialized background, so presenting evidence on the results of such a search does not require expert testimony; and that Browning's testimony that online information about the attack will hurt Charalambopoulos' job prospects, future business relationships, and interpersonal relationships falls within the common knowledge of the jurors. Grammer contends that, "[i]n sum, although Browning's testimony has the veneer of his purported expertise in 'social media,' an average juror can readily understand the potential reputational harms arising from the alleged defamatory social-media postings." *Id.* at 11.

As a general matter, expert testimony is not needed when issues are within the common knowledge of the jury.  *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962).  And to the extent Browning intends to offer expert testimony that "the online publicity surrounding the false accusations of domestic violence against [Charalambopoulos], much of it engineered, instigated, or at least encouraged by [Grammer] via social media has had a devastating and potentially crippling effect on the reputation of [Charalambopoulos]," D. 7/15/16 App. 5, "the subject of [Browning]'s testimony does not appear to be the type that would require expert testimony."  *Saadi v. Maroun*, 2009 WL 3028312, at *1 (M.D. Fla. Sept. 17, 2009).  But although some (if not most) jurors will have at least a basic understanding of social media and the potential impact a statement on social media can have on a person's reputation, the use of Twitter and other forms of social media (and the potentially far-reaching impact of statements disseminated through these means) is not so widespread that the court can say that Browning's expert testimony will not "help the trier of fact to understand the evidence or to determine a fact in issue."[15]  Rule 702.  Accordingly, the court declines to exclude Browning's testimony on the basis that his expert report contains matters that are of common knowledge.

---

[15]For example, even if jurors are generally familiar with running a Google search, they probably do not know the types of results that are returned when a Google search of the name "Dimitri Charalambopoulos" is performed.

E

Finally, Grammer contends that because Browning has no experience or knowledge regarding the due diligence performed before hiring employees or forming business relationships, and because he is not an expert on interpersonal relationships, he is not qualified to provide expert testimony on these topics. Charalambopoulos responds by listing five articles that Browning has authored regarding social media and the law. He contends that Browning

> has also conducted countless presentations on social media and
> its relationship to the law. As the author of [numerous] articles
> and the leading book on social media's impact on the law,
> Browning is frequently sought out by national and international
> media on the subject. He has appeared on television, radio,
> podcasts and webinars discussing social networking. By virtue
> of his education, training, and experience, Browning is qualified
> as an expert to render opinions in the area of forensic pathology.

P. 8/25/16 Br. 4.

Although, as the court has noted above, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue," *Rolls-Royce Corp.*, 2010 WL 184313, at *4 (quoting *Huss*, 571 F.3d at 452), a proffered expert must nonetheless be qualified based on his knowledge, skill, experience, training, or education. Browning does not appear to have any expertise or personal knowledge that would enable him to testify regarding "the due diligence performed before hiring employees or forming business relationships," D. 7/15/16 Br. 11. And Browning conceded during his deposition that he is not an expert on interpersonal relationships. *See* D. 7/15/16 App. 58. Accordingly, the court

concludes that Browning is not qualified to offer expert testimony on the effect online statements will have on Charalambopoulos' interpersonal relationships or his ability to earn a living.

## F

The court grants in part Grammer's *Daubert* motion with respect to Browning. Browning will not be permitted to testify regarding the effect online statements will have on Charalambopoulos' interpersonal relationships or his ability to earn a living.  But the remaining parts of Browning's expert report and testimony are not subject to exclusion under *Daubert*.

## IX

Grammer moves to strike the expert report of Dr. Gruszecki, a forensic pathologist. In support of this motion, Grammer contends that Dr. Gruszecki's testimony is unreliable because, based on her own opinions, she has testified that the quality of the photographs she reviewed makes it impossible for her to determine the extent of, and even the existence of, any injuries to Grammer; she fails to take any of Grammer's relevant personal characteristics into account in rendering her opinion; and her opinion that the bruising to Grammer's wrists could have been caused by the placement of an IV rests on an unsupported assumption and is therefore inadmissible under established law.

The court declines to exclude Dr. Gruszecki's opinion based on the poor quality of the photographs she reviewed, her failure to take any of Grammer's personal characteristics into account in rendering her opinion, or her assumption that an IV or venipuncture was

placed on the anterior aspect of either of Grammer's arms.  "[Q]uestions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [trier of fact's] consideration." *Viterbo*, 826 F.2d at 422.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.  Any deficiencies in Dr. Gruszecki's conclusions as a result of the quality of evidence she considered, her failure to consider other evidence in the record, or her reliance on false assumptions can be attacked at trial through the same means.  For example, Grammer can demonstrate through cross-examination and her own evidence the poor quality of the photographs on which Dr. Gruszecki relied, Dr. Gruszecki's failure to take Grammer's relevant personal characteristics into account, and the lack of evidence that an IV or venipuncture was placed on the anterior aspect of either of Grammer's arms.  Accordingly, the court denies Grammer's motion to exclude Dr. Gruszecki.

*   *   *

For the reasons explained, Grammer's motion to partially modify scheduling order to permit her to re-designate  Holden as an expert in her case-in-chief is granted on the condition that she permits Charalambopoulos to take Holden's deposition; Grammer's motion for bifurcated trial of exemplary damages is granted; Grammer's motion to strike Charalambopoulos' designation of Dr. Ramirez is granted; Grammer's motion to strike Francis is granted in part and denied in part, and her motion to strike re-designation of

Francis as an affirmative expert is granted; Grammer's motion to strike Charalambopoulos' expert Collins is granted in part and denied in part; Grammer's motion to strike Charalambopoulos' expert Browning is granted in part and denied in part; and Grammer's motion to strike Charalambopoulos' expert Dr. Gruszecki is denied.

**SO ORDERED**.

March 8, 2017.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE